R. B. COMPANY, Inc., and Nu Plastics, Inc., Appellants,

v.

AETNA INSURANCE COMPANY et al., Appellees.

No. 18842.

United States Court of Appeals Fifth Circuit.

March 1, 1962.

Rehearing Denied March 27, 1962.

James R. Alexander, Henry Klepak, Arthur S. Goldberg, Don Allen Henry, Goldberg & Alexander, Dallas, Tex., for appellants.

R. B. Cousins, Thompson, Coe, Cousins & Irons, Dallas, Tex., for appellees.

Before JONES, BROWN and GEWIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This case presents the question whether the District Court on a special issue verdict correctly entered judgment for the Insurer. In doing so the Court sustained the Insurer's defense that the insurance either was void altogether because of wilful misrepresentation as to hazards, or at least suspended at the time of the fire by reason of substantial increases in hazards over those incidental to the use described in the policy. The Assured's appeal presents numerous errors including the insufficiency of the evidence, improper jury instruction, and conflicts in the answers to the special interrogatories.

Three policies are now involved, each issued by the same Insurer [1] to two related, but not identical, concerns covering the building and certain contents in Garland, Texas. It simplifies discussion to refer to these as the 56 Building Policy,[2] the 57 R. B. Co. Contents Policy,[3] and the 58 Nu-Plastics Contents Policy.[4]

Several things are unique about this case. First, as we point out in greater detail, the occupancy stated on the initial policy, the 56 Building Policy (note 2, supra), was a term selected by the Insurer's agent. It was not correct and, to the knowledge of several responsible agents of the Insurer, it did not accurately describe operations being conducted on the insured premises. That probably came about from another almost simultaneous error of the Insurer. The building structures were made up of a smaller, older building and a contiguous newer concrete block structure (with one common wall). The older, smaller building was used by Nu-Plastics. The newer building was used primarily by R. B. Co., Inc. Each building had separate street numbers. The Insurer really intended

1. Insurance Company of North America.

2. Building Policy: dated August 27, 1956 for a term of five years. The Assured: R. B. Company, Inc.. Occupancy stated: "Machinery Repair and Sales." Amount: $30,000.

3. R. B. Co. Contents Policy: dated October 30, 1957 for a term of one year.

Assured: R. B. Company, Inc. Occupancy stated: "Machinery Sales." Amount: $20,000.

4. Nu-Plastics Contents Policy: dated March 12, 1958 for a term of one year. Assured: Nu-Plastics, Inc. Occupancy stated: "Plastics Manufacturing." Amount: $15,000.

to insure only the larger building, but as there was a mortgagee to be listed also as a named assured, the legal description of the mortgage was used. This admittedly covered both buildings. While the Insurer subsequently recognized that it was legally bound for the whole structure, this perhaps explains why it was so uninterested in the operations being conducted in the older building by Nu-Plastics.

But the Insurer was not ignorant of what was going on. An authorized agent of the Insurer, Frederickson, made at least two inspections of the premises at or about the time the 56 Building Policy was issued. While he tended to magnify the secret nature of the plastic recovery process being conducted, he acknowledged, and it was not disputed, that at least up through the beginning of 1957, Nu-Plastics was engaged in substantial plastic recovery operations requiring the use of flammable chemicals. More than that, the inspection was made primarily because another insurance company to whom the risk was offered declined to cover it because of excessive hazards.

At that time, Nu-Plastics was engaged in a process of attempting to recover separately the copper and the polyethylene in the plastic insulation of salvage copper wire. In this process perchlorethylene or trichlorethylene was used in a mixture with isopropyl alcohol. The *per* and *tri*chlorethylene were substantially nonflammable and the percentage mixture used with isopropyl alcohol considerably reduced the flammability of the alcohol. Also used or regularly on the premises was acetone, a chemical compound having a zero to plus one flash point (in contrast to a flash point of 20 to 40 of naphtha). Sometime in 1957 they began to use cyclohexane instead of the *per* or *tri*chlorethylene. This is extremely flammable with a flash point in the neighborhood of one.

It was in this setting that the 56 Building Policy was issued. It described the occupancy as "Machinery Repair and Sales." No one to this day has identified the person who actually selected that descriptive. Nor was there any explanation of why that terminology, rather than some other, was used. What is known, and what is undisputed, is that the term was chosen by the Insurer. Of course the occupancy descriptive is very significant. It bears upon the scheduled manual rates fixed by the Texas Insurance Commission. And it is the foundation of the provision against increase in the hazard.[5]

The 57 R. B. Co. Contents Policy was issued in October 1957. No further inspection was made by the Insurer and the record is absolutely silent concerning any representations made by the Assured at or before the time this Policy was applied for or issued. Frederickson testified that he was simply relying on what he learned the previous August and September in connection with the 56 Building Policy. This time, however, and again with no indication of why this terminology was chosen or changed, the occupancy was described as "Machinery Sales."

Although it is not clearly spelled out, it appears that the 58 Nu-Plastics Contents Policy was requested in early January 1958 about the time other policies originally in the suit (but no longer involved) were issued by other insurance companies. At any event, the 58 Nu-Plastics Contents Policy was not issued until March 12, 1958. The record is again blank on how the descriptive was selected, but the policy describes the occupancy as "Plastics Manufacturing." The record is likewise equally silent con-

5. Each policy contained this provision:
   "Conditions suspending or restricting insurance. Unless otherwise provided in writing added hereto, this Company shall not be liable for loss occurring * * * "(a) while the hazard is increased by any means within the knowledge and control of the insured, provided such increase in hazard is not usual and incidental to the occupancy as hereon described * * *."

cerning any representations made by the Assured as to the nature or kind of operations then being conducted on, at, or before, the time the policy was applied for or delivered.

The fire of May 30, 1958, occurred while each of these policies was nominally in force. In the meantime, two significant events admittedly occurred and there is controversy whether the third did. First, sometime in early 1957, Nu-Plastics abandoned the polyethylene-copper recovery process. Its activity thereafter was of an experimental nature. Second, in the middle of 1957 a new concern, Customs Distillers, owned and operated as a sole venture of one of the stockholder-owners of R. B. Co. and Nu-Plastics, commenced the removal of chemicals from salvaged naphtha. The third, and hotly disputed, question was whether a doorway in the common wall between the older-small building and the larger one had been cut before or after the 56 Building Policy was issued.

On these three events, the Insurer denied the policies were effective. Its contention ran this way. The third undercut all for if, as the Insurer's proof tended to show, the doorway was cut into the common wall after the delivery of the 56 Building Policy, the jury could find that there was an increase in hazard since under applicable Texas Insurance Commission rules for rating, this breach of a fire wall would automatically compel the higher rate (plastics manufacturing) for the whole structure.

■ The second event, if not decisive as a matter of law, is at least significant since, being wholly the activity of Customs Distillers, this eliminated altogether the element of whether the use of naphtha was usual and incidental to the occupancy of the Assured (either R. B. Co., Inc. or Nu-Plastics, Inc.) as that term is used in the hazard suspension clause, see note 5, supra. This second event—the distillation of naphtha in vats at high temperature—also permitted a jury finding that the hazard was increased over (a) the described occupancy of Machinery Sales as well as (b) the actual occu-

pancy and hazards of the Nu-Plastics process being followed in 1956–1957. In connection with this aspect, the increase in hazard was established by two types of proof: expert testimony comparing relative flammability of naphtha with these other chemicals and, perhaps more persuasive, the high rates commanded by the Insurance Commission manual for storage of naphtha and other volatiles.

■ The Insurer in asserting these defenses did not shirk from the burden imposed by Texas law of sustaining them. Dixie Fire Ins. Co. v. Henson, Tex.Civ. App., 1925, 277 S.W. 756, Aff'd Tex.Com. App., 285 S.W. 265; St. Paul Fire & Marine Ins. Co. v. Westmoreland, Tex. Com.App.1937, 130 Tex. 65, 105 S.W.2d 203. See 24B Tex.Jur.Insurance §§ 435, 436, 462. The Assureds, on the other hand, rejoined generally with the denial of misrepresentation of hazards and, as a sort of confession and avoidance, asserted that the Insurer knew, or ought to have known, of these increased hazards and with such knowledge, actual or constructive, continued to receive premiums. On that was rested its claim of waiver and estoppel.

■ The trial Judge considered this a case for the jury and, overruling motions of the Assured and the Insurer for directed verdict, submitted it on the basis of special interrogatories, F.R.Civ.P. rule 49, 28 U.S.C.A., after carefully following the suggestion of Clegg v. Hardware Mutual Casualty Co., 5 Cir., 1959, 264 F.2d 152, at 157, that the parties should be informed of this proposed submission.

The verdict is something less than satisfactory. But that does not necessarily involve criticism of Court or counsel or jury. The fact is that one of the sometimes unexpected, but wholesome, results of special interrogatories jury submission is to emphasize the absolute necessity that there be first a clear understanding of the precise legal issues for jury resolution and then a translation of them into articulate questions which may be authoritatively answered by a simple categorical. In a general way this is to say that not only is it the jury's impreci-

sion which is hidden by the traditional general charge and verdict. Many juridical errors of omission and commission by court and counsel are likewise perpetually concealed.

As to these three separate policies, the verdict comprised a series of six questions as to each policy.[6] Streamlining them sharply they were:

At the time of the issuance of each policy was the occupancy and hazard greater than that described on the *face of the policy?*[7]

Subsequent to the issuance of the policy, did naphtha distilling increase the hazard over that stated on the *face of the policy?*[8]

Was there a willful misrepresentation by the Assureds of the occupancy or hazard?[9]

At the time of the issuance of the policy, did the Insurer know of the actual hazard and occupancy?[10]

Subsequent to the date of the issuance of the policy, did the Insurer know of the actual hazard and occupancy?[11]

If there was willful misrepresentation of the hazard by the Assureds, did the Insurer nevertheless accept premiums knowing of the actual hazard and occupancy?[12]

In brief the jury answered[13] that as to the 56 Building Policy the actual hazard was greater than that described on the *face of the policy,* but that there was no willful misrepresentation by the Assureds of the hazard; that at the time the policy was issued, the Insurer knew of the actual hazards, but that subsequent to the date of the policy, the Insurer did not know; no answer was made whether there was a receipt of premiums with knowledge since no misrepresentation was found; that the naphtha distilling operation constituted an increase in hazard over the hazard described *on the face of the policy.*

The answers as to the 57 Contents and 58 Contents Policy differed sharply from

6. 56 Building Policy: Issues 1–5; 57 Contents Policy: Issues 6–10; 58 Contents Policy: Issues 11–15.

7. Issues 1, 6, 11.

8. Issues 1–A, 6–A, 11–A.

9. Issues 2, 7, 12.

10. Issues 3, 8, 13.

11. Issues 4, 9, 14.

12. Issues 5, 10, 15. This was conditioned on a "yes" to Issues 2, 7, 12.

13. The problem is graphically portrayed by this tabular synopsis of the verdict (the numbers refer to special issue numbers):

| | At Time Issuance Policy was Occupancy Different and Hazard Greater Than on Face of Policy? | Subsequent to Date of Issuance was Hazard Increased Over That Stated on Face of Policy by Naphtha Distilling? | Was There Willful Misrepresentation of Occupancy or Hazard? | On Date of Issuance of Policy did Insurer Know of Hazard and Occupancy (Referred to in No. 1, 6, 11)? | Subsequent to Date of Policy did Insurer Know of Hazard and Occupancy (Referred to in No. 1, 6, 11)? | If Answer Preceding (No. 2, 7, 12) "Yes" did Insurer Accept Premiums Knowing of Actual Hazards? |
|---|---|---|---|---|---|---|
| 56 Building Policy | 1. Yes | 1-A. Yes | 2. No | 3. Yes | 4. No | 5. ——— |
| 57 R. B. Co. Contents Policy | 6. Yes | 6-A. Yes | 7. Yes | 8. No | 9. No | 10. No |
| 58 Nu-Plastics Contents Policy | 11. Yes | 11-A. Yes | 12. Yes | 13. No | 14. No | 15. No |

this. Just as it had respecting the 56 Building Policy, the jury found as to each of these that there was a greater hazard than described on the *face of the policy*, and that naphtha distilling was an increase in hazard over that described on the *face of the policy*, and that subsequent to the date of the policy the Insurer did not know of the actual hazard and occupancy. But where, as to the 56 Building Policy, the jury found no willful misrepresentation by the Assured but knowledge by the Insurer of the actual hazard at the time of the policy issuance, it now found that there was a willful misrepresentation and that on the date of the issuance of these two policies, the Insurer did not know of the increase in hazards over the *face of the policy;* finding willful misrepresentation, the jury also found there was no acceptance of the premiums with knowledge of such misrepresentation.

The Assureds attack this verdict and the judgment based on it on several grounds. First, they contend there is no evidence to support some, if not all, of the adverse answers. Second, there is a conflict in the answers to special issues which prevents judgment for either party. Third, there was an intrinsic error as to Issues 8, 13, 9, and 14 since this inquired merely whether the Insurer *knew* and did not include whether the Insurer *ought to have known*. Fourth, related generally, the Court failed to give subsequent explanatory instructions when the jury reported it was confused about the charge.

■ Without a doubt, we agree with the Assureds that some of the an-

swers are without sufficient evidence to sustain them.[14] For example, by the answer "No" to Issues 4 and 9 (note 13, supra), the jury found that subsequent to the date of the 56 and 57 Policy, the Insurer did not know of the increase in hazard over the occupancy described on the *face of the policy*. But as to the 56 Policy, the evidence was uncontradicted that in September 1956 and after its issuance (August 27, 1956) Frederickson and, subsequently, a rating inspector each made a detailed inspection of the premises, and it was positively known by them that the plastics recovery operation was going on in the little adjoining building. The jury found as much by the "Yes" answer to No. 3. Obviously, this knowledge gained in August-September 1956 was known both at the time of the issuance of the 57 Contents Policy and *subsequent* to its issuance. Consequently, the "No" answer to No. 9 was unsubstantiated, just as was the "No" to No. 4. Automatically that strikes down the finding, through the "No" answer to No. 8, that at the time of the *issuance* of the 57 Contents Policy the Insurer did not know that the hazard was increased over the *face of the policy*.[15]

■ Even more unfounded was the finding of willful misrepresentation of hazard and occupancy as to the 57 and 58 Contents Policies through the "Yes" answer to Nos. 7 and 12. There is simply no evidence of any representation at or before the application, issuance or delivery of the 57 Contents Policy. Frederickson affirmatively acknowledged that he relied on what he knew and had learned in connection with the 56 Build-

14. We do not determine whether the Assureds' broad, oral motion for instructed verdict was sufficiently specific, see F.R. Civ.P. rule 50(a), since, as to these answers, we conclude that the absence of evidence was so marked that, if the case finally turned on them, the trial Court was obligated to grant the Assureds' motion for a new trial. Thomas v. Atlantic Coast Line Railroad Co., 5 Cir., 1955, 223 F.2d 1, 4; Kirby Lumber Corp. v. Laird, 5 Cir., 1956, 231 F.2d 812 at 816; Commercial Credit Corp. v. Pepper, 5 Cir., 1951, 187 F.2d 71; White-

man v. Pitrie, 5 Cir., 1955, 220 F.2d 914, 918–19; Miller v. Tennessee Gas Transmission Co., 5 Cir., 1955, 220 F. 2d 434; Marsh v. Illinois Central R. Co., 5 Cir., 1949, 175 F.2d 498, 500.

15. As to the 58 Contents Policy the Assureds make a similar argument concerning the "No" answer to Nos. 13 and 14. Without passing one way or the other on it at least one distinction must be recognized. The 58 Contents Policy described the occupancy as "Plastics Manufacturing," not the wholly inaccurate descriptive "Machinery Sales."

ing Policy. Of course, as the finding of no misrepresentation (Issue 2) reflects, Frederickson and the inspector got every fact they asked for. There was no faulty or untrue information or any concealment. The record is even more silent as to the 58 Contents Policy. What was stated, what was incorrect, or untrue, or false, or incomplete in what was stated are all unknowns. The only possible basis from which to infer a willful misrepresentation is to say that the physical receipt by the Assured of the 57 Policy was an implied representation that the activities being conducted on. the premises were those misdescribed by the Insurer's own errors as "Machine Sales," and that this, to the knowledge of the Assured (but not to that of the Insurer) was incorrect. Whatever may be the legal consequences binding an Assured to what a policy states where he does not read it, this does not arise here to a willful misrepresentation.[16]

To all of this the Insurer makes the persuasive reply that this merely knocks out the issues on willful misrepresentation. It does not affect the issues on the distinct and separate defense that there was in fact an increase in hazard.

■ But going to the remainder of the verdict requires that we carefully analyze it in terms of the asserted internal conflict in the answers. We think that there is at least an ostensible conflict between the "Yes" and "No" answers to Issues 3 and 8, and perhaps 13 (see note 13, supra). What the Insurer knew in 1956 at the time of the issuance of the 56 Building Policy, it could not forget in October 1957. So if it knew in 1956, as the jury found, that the actual hazard and occupancy was substantially different from the descriptive "Machine Sales," it knew *that much* in October

1957 when it acted through the same agent who confessedly relied on what he previously knew.

To overcome this the Insurer urges two things. The first is that each series of issues relates to a separate policy so there need be no consistency between the years. That might technically be correct, but this ignores the existence of the two findings. More than that, what the Insurer knew in 1956 is, or certainly may be, relevant to what it knew in 1957. Especially is this so since its own agent acknowledged that in 1957 he acted wholly on 1956 information. The combination of these two issues (3 and 8) is therefore the same as though the Court had specifically submitted it in this fashion with respect to the 1957 Contents Policy: (a) *before* the issuance of the policy did the insurer know the facts of hazard over that stated on the face of the policy? (b) At the time of issuance of the policy did it know such facts?

■ The second reason advanced by the Insurer is more substantial. It points out that this Court has many times held that the Court is compelled to reconcile apparently contradictory, conflicting answers if this may be accomplished. Rorem v. Halliburton Oil Well Cementing Co., 5 Cir., 1957, 246 F.2d 427 at 432; Cox v. Esso Shipping Co., 5 Cir., 1957, 247 F.2d 629 at 636, 1957 A.M.C. 1927; McVey v. Phillips Petroleum Co., 5 Cir., 1961, 288 F.2d 53, 59.

Following that approach the Insurer urges that they may be reconciled because the facts show a change in actual operations during early 1957. Thus, between September 1956 and October 1957, Nu-Plastics had virtually ceased its recovery operations. In the meantime, Customs Distillers had commenced its

---

16. As to the 58 Contents Policy describing the occupancy as "Plastics Manufacturing" the argument would require the evidence to show that knowing the policy used that descriptive the Assured knew that naphtha distilling was more hazardous than "Plastics Manufacturing." But there was no evidence on what "Plastics Manufacturing" covered, or what hazards

might be expected. What evidence there was was limited to a comparison between the plastic recovery operations conducted in 1956—early 1957 with naphtha distilling. The two might be quite different. Quite apart from other errors discussed, this insufficiency in the evidence would compel a new trial as to the 58 Contents Policy.

naphtha distillation. Consequently, the jury could have held that the Insurer in 1956 knew all about the Nu-Plastics operation and could have found that it was more hazardous than that described on the face of the policy. But equally, it contends, the jury could have held that (a) the Insurer in October 1957 did not know of the naphtha operation, and that (b) it presented a hazard greater than that described on the *face of the policy*.

■ In appraising this contention, we must bear in mind that taking findings at their face value presents a function quite different from the court-imposed obligation to reconcile contradictory ones. In the former situation, whatever deficiencies there might be in the adequacy or formulation of the issues themselves, goes out of the case through the operation of F.R.Civ.P. rule 49(a). Under this Rule the Court either makes, or is presumed to have made, findings sufficient to sustain the judgment entered. But in reconciling conflicts, the test is whether the answers may fairly be said to represent a logical and probable decision on the actual relevant issues as submitted even though, as Rorem and Cox illustrate, the form of the issue or alternative selective answers prescribed by the Judge, may have been the likely cause of the difficulty and largely produced the apparent conflict.

■ Tested in that light, it is plain that in the form of submission used, the correct standard of comparison of hazard was not submitted at all. Certainly this was true of the 56 and 57 Policies.

The issues under scrutiny (3, 8 and 13) all made express reference to Issues 1, 6 and 11. These in turn inquired whether the occupancy and hazards were substantially greater than those de-

scribed on the *face of the policy*. Yet this record is uncontradicted that the *face of the policy* did not correctly describe the activities, and hence hazards, being conducted on the insured premises. This error was in no way attributable to the Assureds. It was wholly the making of the Insurer's agents. Obviously, the provision against increased hazards—though phrased in terms of the descriptive on the face of the policy (see note 5, supra)—would not prohibit the Assureds from conducting all of the operations then being carried on in, say September 1956, by Nu-Plastics even though this presented hazards greatly in excess of "Machine Sales."

The critical problem was whether subsequent operations involved hazards in excess of those which the Insurer actually knew to exist, but which were improperly described. But none of the issues covered that. Issues 3, 8 and 13 always came back to the *face of the policy* just as did 1, 6 and 11. And in this process of reconciliation with them also falls Issues 1–A, 6–A and 11–A since the comparative between the subsequent naphtha distillation was not with the plastics operation—as actually conducted and known—but with the erroneous description on the face of the policy.

When so much of the verdict is made up of answers which are not sustained by the evidence and the really critical issue on increase of hazard was not submitted to the jury at all, we consider that we would displace the jury by undertaking to make the reconciliation suggested.[17] Consequently, there being conflicts no judgment may be entered and the cause must be retried.

■ In remanding the case for a new trial, we take pains to point out that the

17. The Insurer urges that quite apart from the naphtha distillation the opening up of the common wall would constitute an increase in hazard without regard to the descriptive on the face of the policy. And since, it argues, there was a conflict we must read the answers as though the increase in hazard was based on the wall opening. However, this could not possibly apply to the 57 and 58 Policies. The only evidence favorable to the Insurer was that the doorway was not open in August-September 1956 at the time of the 56 Building Policy inspection by Frederickson. There is no evidence that if then closed as Frederickson insisted, the doorway was opened *after* October 1957 or March 1958.

sufficiency of the evidence is to be measured by what is there produced. Nothing said here is a prejudgment or a forecast of the issue or issues which are or are not for jury submission. McGowan v. United States, 5 Cir., 1961, 296 F.2d 252 [No. 19078, Nov. 17, 1961]; Smoot v. State Farm Mutual Auto Ins. Co., 5 Cir., 1962, 299 F.2d 525 [No. 18815, 1962]; Travelers Ins. Co. v. Busy Electric Co., 5 Cir., 1961, 294 F.2d 139.

Reversed and remanded.