David L. MORRISON et al., Plaintiffs-Appellees Cross-Appellants,

v.

FRITO–LAY, INC., and Marilyn L. Taggart, Defendants-Appellants Cross-Appellees.

Margaret E. Tepper JOHNSON, Plaintiff-Appellee,

v.

Roseland M. BOSTWICK, Defendant-Appellant Appellee.

No. 75–1941.

United States Court of Appeals, Fifth Circuit.

Jan. 31, 1977.

Rehearing and Rehearing En Banc Denied March 16, 1977.

John W. Crowell, Hunter M. Gholson, Columbus, Miss., W. Scott Welch, III, Roger C. Landrum, Richard L. Forman, Jackson, Miss., for Frito-Lay, Inc., et al.

Gary L. Geeslin, Columbus, Miss., for R. M. Bostwick.

Michael D. Jonas, Ralph E. Pogue, Aberdeen, Miss., Gary B. Blasingame, Nickolas P. Chilivis, Athens, Ga., for David L. Morrison, et al.

Thomas J. Tubb, West Point, Miss., Shields Sims, Darrell Reeves, Columbus, Miss., for M. E. Johnson.

Before RIVES, GOLDBERG and GEE, Circuit Judges.

RIVES, Circuit Judge:

On the evening of January 18, 1971, at approximately 6:30 p. m., a van-type truck, owned by defendant Frito-Lay, Inc., and being driven by defendant M. L. Taggart, became disabled as it proceeded southward on the two-lane Mississippi Highway 373 near Columbus, Mississippi. After coasting in neutral for two or three minutes, Taggart brought the truck to a stop at the side of the road leaving "at least" two feet of the van's body protruding onto the paved portion of the highway. (App. 121, 585.) Taggart turned off the truck's headlights, engaged the emergency flasher, and remained inside the van attempting to locate the cause of the engine's failure. (App. 586.) Within a few minutes after the truck had come to a stop, an Opel automobile being driven southward by the defendant Roseland Bostwick collided with the rear end of the Frito-Lay van. (App. 163.) The impact knocked the van completely off the paved road and Taggart was forced to the rear of the van. (App. 86, 90.) Taggart therefore did not actually see the Bostwick car strike his van. Mrs. Bostwick was rendered unconscious by the impact and had no recollection of the subsequent events. (App. 172–73.) The exact location of the Bostwick Opel immediately after this collision is unknown, but it eventually came to rest facing south in the center of the highway. (App. 432–33.)

Within minutes of the Taggart-Bostwick collision another collision occurred nearby.[1] A Chevrolet being driven by Dwight C. Laughlin, moving southward down Highway 373, collided with a Pontiac being driven by Max Tepper which was proceeding in

---

1. Taggart testified that the van had not yet stopped rolling from the impact when he heard the sounds of another collision. "Q. And it was while your vehicle was rolling to a stop after being hit by the Opel, was it not? A. Yes, I suppose so." (App. 613.)

the opposite direction. Tepper and a passenger in his car were killed instantly. There were four occupants of the Laughlin car, two of whom survived. However, neither of the survivors was paying attention to the road at the time of the accident; consequently neither could shed light on how the accident occurred. Laughlin was killed instantly and the remaining passenger, David Morrison, died three hours later.[2]

Wrongful death actions[3] were brought by the family of David Morrison, deceased, and by the widow of Max Tepper and were consolidated for trial. The first crucial issue was whether there existed a causal relationship between the Taggart-Bostwick collision and the fatal Tepper-Laughlin collision. The Morrison plaintiffs' theory was that Tepper either struck the Bostwick Opel or swerved suddenly to avoid it, and that this alleged Tepper-Bostwick collision or near miss caused the fatal Tepper-Laughlin accident.

Evidence introduced at trial was derived from two independent investigations of the fatal collision. One of these was conducted by Mississippi Highway Patrolman Grady Prevost, who arrived shortly after the accident. He found that the Laughlin Chevrolet and the Tepper Pontiac were on opposite sides of the road with a gouge mark between them. (App. 427.) Patrolman Prevost estimated that this gouge mark was approximately 75 feet north of the spot where the Bostwick Opel had come to rest. (App. 427.) He found the Laughlin automobile facing northeastward, completely blocking the southbound lane of the highway, and the Tepper Pontiac pointing northeastward with the rear end of the car partially obstructing the northbound lane of the highway. (App. 408–09, 414, 422.) To the south of the Tepper and Laughlin vehicles, Prevost found the Bostwick Opel facing southward and straddling the centerline of the highway and the Frito-Lay van completely off the highway to the west. (App. 415, 432–33.) Prevost located a set of skid marks which began in the northbound lane near the east edge of the pavement and close to the rear of the Bostwick Opel and continued for some 75 feet gradually coming nearer the centerline, terminating at the gouge mark in the northbound lane.[4]

A second and independent investigation was conducted by Air Force Safety Technician Hawkins,[5] who arrived on the scene approximately thirty minutes after the accident. His findings differ in several respects from those of Prevost. Most importantly, Hawkins testified that the skid

---

**2.** As previously mentioned, Bostwick had no recollection of the fatal collision; Taggart was in the back of the van at the time of the Tepper-Laughlin collision; and the two survivors in the Laughlin car were not paying attention to the road, although they testified that they did not feel a swerve or change of direction in the Laughlin automobile. Jackie Harris, a passenger in the Laughlin car did give *some* eyewitness testimony:

"... I wasn't looking down because the headlights—after I looked at them for maybe a half a second they seemed to be coming right at us, and naturally my attention was focused on the headlights. And, of course, I didn't have too much time to think about it before they hit us." (App. 292.)

Harris was unable to state on which side of the road the collision occurred, nor was he able to testify as to the location of the other vehicles.

**3.** One was brought by the father, mother and sister of David Morrison, deceased, against Frito-Lay, Inc., M. L. Taggart, Roseland Bostwick, the Estate of Max Tepper, the Estate of Dwight C. Laughlin, and Modern American Life Insur-

ance Company. The other action was brought by Mrs. Margaret E. Tepper, Administratrix of the estate of Max Tepper, against Bostwick, Taggart, Frito-Lay, Inc., and the Estate of Dwight C. Laughlin.

**4.** (App. 410, 439.) Prevost testified as to the exact location of the gougemark: "Q. About how far from the centerline was it in that lane? A. I got it two feet and eight inches." (App. 440.)

**5.** On January 18, 1971, Hawkins had been an Air Force Safety Technician about five or six years, that is since 1965. His duties included investigating automobile collisions involving base personnel in which there was as much as $100 damage to government property, injury to personnel, or a *fatality*. It was in that capacity that he was "called upon to investigate an accident occurring on Highway 373 south of Columbus Air Force Base on January 18, 1971." (App. 175–76.) All occupants of the Laughlin automobile were Air Force personnel. (App. 177, 283.)

marks in question ran northward terminating at the Bostwick Opel, rather than commencing at that point. (App. 179–80.) Hawkins further stated that at the northern end the skid marks swerved off the highway to the east but that he found tire tracks which indicated that the car returned to the highway headed toward the "crash site." (App. 205–06, 226–27.) Hawkins found that the "crash site" was approximately 130 feet from the end of the skid marks. (App. 179.) Hawkins also located gouge marks in the pavement at the "crash site," however, unlike Highway Patrolman Prevost, Hawkins placed these marks in the southbound lane of the highway. (App. 221–22.)

The district judge submitted the issues to the jury in the form of a special verdict with interrogatories as provided by Rule 49(a), F.R.Civ.P. The jury found that Taggart was negligent in failing to move the truck completely from the paved portion of the highway and that his negligence proximately caused the Tepper-Laughlin collision which resulted in the deaths of Tepper and David Morrison. As to Mrs. Bostwick, the jury found that she was negligent in operating her automobile at a rate of speed in excess of that which was reasonable and proper under the circumstances, in failing to keep a reasonable and proper lookout for other vehicles, and in failing to have her automobile under reasonable control. Her negligence was also found to be a proximate cause of the Tepper-Laughlin collision.

The jury returned a verdict of one hundred twenty-five thousand dollars ($125,000) for the Estate of Max Tepper against the defendants Frito-Lay, Taggart and Bostwick. A verdict of three hundred twenty-five thousand dollars ($325,000) was re-

turned in favor of the Morrisons against the defendants Frito-Lay, Taggart and Bostwick. The trial court granted a judgment n. o. v. reducing this latter sum by twenty-five thousand dollars ($25,000), which was the amount the jury had awarded the Morrisons for the pain and suffering of David Morrison.[6]

On appeal the defendant-appellants Taggart, Frito-Lay and Bostwick urge that the trial court erred: (1) in failing to declare a new trial upon receipt of inconsistent answers to the special verdict interrogatories submitted to the jury pursuant to the provisions of Rule 49(a), F.R.Civ.P.; (2) by submitting to the jury an additional interrogatory after having received inconsistent answers to the interrogatories propounded to the jury; and (3) in failing to sustain their motions for directed verdict and for judgment n. o. v. by reason of the failure on the part of the plaintiffs to introduce substantial evidence that negligence by said defendants was a proximate or contributing cause of the death of either David Morrison or Max Tepper. The Morrisons on cross-appeal argue that the trial court was in error in sustaining defendant-appellants' motion for a judgment n. o. v. as to the jury's award of $25,000 to the Morrisons for the pain and suffering of David Morrison.

*Rule 49(a), F.R.Civ.P.*

This case was submitted to the jury on twenty-two written interrogatories, pursuant to Rule 49(a), F.R.Civ.P.[7] The answers made to these interrogatories created an ambiguity or uncertainty as to the jury's resolution of the question of whether Max Tepper was guilty of any negligence which proximately caused or contributed to the fatal collision. The ambiguity arises out of the following interrogatories and answers:

---

**6.** The estates of Tepper and Laughlin and the Modern American Life Insurance Company were found not to be liable.

**7.** The opening sentence of Rule 49(a) reads:

"The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact."
The special verdict appears in Vol. II of the Record on Appeal at pages 377–386.

"INTERROGATORY NO. 9

"Do you find from a preponderance of the evidence that the Tepper automobile collided with the Bostwick automobile?

"Answer:     Yes
          Enter 'Yes' or 'No'

"[If you have answered the preceding interrogatory in the affirmative, then answer Interrogatory No. 10; otherwise, do not do so.]

"INTERROGATORY NO. 10

"Do you find from the preponderance of the evidence that the collision of the automobiles was proximately caused or contributed to by:

"a) Tepper's failure to keep and maintain a reasonable and proper lookout for vehicles in or near the highway in front of him?

"Answer:     No
          Enter 'Yes' or 'No'

"b) The operation by Tepper of his automobile at a rate of speed in excess of that which was reasonable and proper, taking into consideration the circumstances then and there existing which were apparent to him, or which might have been apparent to him by the exercise of ordinary care?

"Answer:     No
          Enter 'Yes' or 'No'

"c) Tepper's failure to keep and maintain reasonable control of his automobile:

"Answer:     Yes
          Enter 'Yes' or 'No'

*     *     *     *     *     *

"INTERROGATORY NO. 12

"Do you find from a preponderance of the evidence that Tepper, on the occasion in question, negligently drove his automobile over the centerline of the highway and into the opposite traffic lane where it collided with the Laughlin automobile?

"Answer:     No
          Enter 'Yes' or 'No'

*     *     *     *     *     *

"INTERROGATORY NO. 14

"If you have found in answer to Interrogatories Nos. 10, 11, 12 or 13 that Tepper was guilty of negligence, as such has been defined in the instructions of the court, which proximately contributed to the collision of his automobile with the Laughlin automobile, what percent of the whole negligence proximately causing the collision do you find from a preponderance of the evidence is attributable to Tepper's contributory negligence?

"Answer:     0%
          Enter here the Percent

"INTERROGATORY NO. 15

"Do you find from a preponderance of the evidence that Laughlin, on the occasion in question, negligently drove his automobile over the centerline of said highway and into the opposite traffic lane where it collided with the Tepper automobile?

"Answer:     No
          Enter 'Yes' or 'No'

*     *     *     *     *     *

"INTERROGATORY NO. 17

"Can you determine from the preponderance of the evidence in which lane of traffic the collision of the Tepper and Laughlin automobiles took place?

"Answer:     No
          Enter 'Yes' or 'No' "

(R. Vol. II, pp. 377–381.)

The basis of the ambiguity lies in the jury's response to Interrogatory 10(c) when read in conjunction with the other above-quoted interrogatories and answers. The answers to Interrogatories 10(a), 10(b), 12 and 14 indicate that the jury did not intend to find Tepper guilty of negligence. In fact, in response to Interrogatory 14 the jury found that Tepper was guilty of no negligence which proximately contributed to the collision of the Tepper and Laughlin automobiles. However, in response to Interrogatory 10(c) the jury found that "the collision of the automobiles" was proximately caused by Tepper's failure to "keep and maintain reasonable control of his automobile." The apparent inconsistency of these answers was compounded by uncertainty as to which collision was the subject of Interrogatory 10. That interrogatory was to be answered only if the jury found that the Tepper automobile collided with the Bostwick automobile. It seems likely that the judge intended the phrase "the collision of the automobiles" to refer to the Bostwick-Tepper collision. However, it is not entirely clear to which collision the jury believed the interrogatory referred, particularly in light of the jury's resolution of Interrogatory No. 14. If the jury believed the Bostwick-Tepper collision was caused at least in part by the negligence of Tepper, then its answer to Interrogatory 14 was clearly inconsistent with its answer to Interrogatory 10(c). If, however, the jury understood the collision in question to refer to the Tepper-Laughlin collision, no incon-

sistency would exist, because it is reasonable to assume that the jury found Tepper through no fault of his own was unable to maintain control of his car after its collision with the Bostwick automobile.

In order to resolve this ambiguity the trial judge submitted the following additional interrogatory to the jury:

"SUPPLEMENTAL INTERROGATORY

"In your answer to Interrogatory 10c, did you intend to find that Tepper's failure to keep and maintain proper control of his automobile proximately caused or contributed to the collision of the Bostwick and Tepper vehicles or did you intend to find Tepper's failure to keep and maintain proper control of his automobile proximately caused or contributed to the [sic] Laughlin and Tepper automobiles.

"Enter your answer here:

"Tepper lost control after hitting the Bostwick auto.

"February 8, 1974

"William F. Hodges
"Foreman
"2–8–74"

(R. Vol. II, p. 385.)

The defendant-appellants urge that the trial court erred in not ordering a new trial on the basis of the "inconsistency" in the jury's response to the special interrogatories and in submitting to the jury an additional interrogatory.

■ Although Rule 49(a), F.R.Civ.P., does not refer to inconsistent findings, it is clear that in order for a verdict to stand the answers must be consistent and, if not consistent, on appeal the case must be remanded for a new trial.[8] However, before a remand is appropriate this Court is under a constitutional mandate to "search for a view of the case that makes the jury's answers consistent." *Gonzales v. Missouri R. R. Co.*, 511 F.2d 629, 633 (5 Cir. 1975).[9] In the instant case the trial court chose to submit an additional interrogatory to the jury, rather than to attempt to harmonize the jury's responses. It is the propriety of that procedure which this Court must decide.[10]

**8.** *Miller v. Royal Netherlands Steamship Co.*, 508 F.2d 1103, 1106 (5 Cir. 1975); *Colvin v. Dempsey-Tegeler & Co., Inc.*, 477 F.2d 1283 (5 Cir. 1973); *Griffin v. Matherne*, 471 F.2d 911, 915 (5 Cir. 1973); *R. B. Company v. Aetna Insurance Co.*, 299 F.2d 753, 760 (5 Cir. 1962); *see also* Wright & Miller, 9 Federal Practice & Procedure § 2510 (1971).

**9.** A clear statement of this rule is found in *Griffin v. Matherne, supra* n. 8, wherein the court stated:

"Entry of judgment upon a jury's special verdict with written findings of fact is subject not only to precedential guidelines but to a constitutional restraint as well. The Seventh Amendment requires that if there is a view of the case which makes the jury's answers consistent, the court must adopt that view and enter judgment accordingly. *Atlantic & Gulf Stevedores v. Ellerman Lines*, 369 U.S. 355, 364, [82 S.Ct. 780, 786, 7 L.Ed.2d 798, 806–807] . . . . This court has stated that the test to be applied in reconciling apparent conflicts between the jury's answers is whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted, even though the form of the issue or alternative selective answers prescribed by the judge may have been the likely cause of the difficulty and largely produced the apparent conflict. *R. B. Company v. Aetna Insur-*

*ance Company*, 299 F.2d 753, 760 (5th Cir. 1962). If on review of the district court's judgment we find that there is *no view of the case* which makes the jury's answers consistent and that the inconsistency is such that the special verdict will support neither the judgment entered below nor any other judgment, then the judgment must be reversed and the cause remanded for trial anew. *Missouri Pacific Ry. Co. v. Salazar*, 254 F.2d 847, 849 (5th Cir. 1958); *Wright v. Kroeger Corporation*, 422 F.2d 176, 178–179 (5th Cir. 1970)."

471 F.2d 911, 915 (emphasis added). See also *Atlantic & Gulf Stevedores v. Ellerman Lines*, 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); *Miller v. Royal Netherlands Steamship Co.*, 508 F.2d 1103 (5 Cir. 1975); *Stacey v. Illinois Central R. R.*, 491 F.2d 542, 545 (5 Cir. 1974); *Adams Machine & Tool Co., Inc. v. MFB Mutual Ins. Co.*, 479 F.2d 439, 444–45 (5 Cir. 1973) (concurring opinion); *Colvin v. Dempsey-Tegeler & Co., Inc.*, 477 F.2d 1283 (5 Cir. 1973).

**10.** That issue was pretermitted in *Griffin v. Matherne, supra* n. 7, 471 F.2d at 917. The related question of reconsideration of inconsistent answers to Rule 49(a) interrogatories has been before this Court on several occasions. Most recently in *Landry v. Offshore Logistics, Inc.*, 544 F.2d 757 (5 Cir. 1977) Judge Coleman held that reversible error had not been commit-

■ The defendant-appellants have correctly stated that Rule 49(a) makes no provision for the course to be followed in the event of inconsistent answers. However, we disagree with their contention that the district court overstepped its authority. It would be anomalous to hold that, while a court pursuant to Rule 49(a) must search for a view of the case which will make the jury's answers consistent, it may not submit an additional interrogatory to the jury to clarify an ambiguity. The facts of this case do not require us to decide whether in every case of irreconcilable inconsistencies in answers to Rule 49(a) interrogatories the trial court is permitted to submit additional interrogatories to the jury to avoid declaring a new trial. We think that clearly, in its discretion, the trial court may submit one or more interrogatories to the jury for the purpose of harmonizing apparent inconsistencies or ambiguities when such harmonization and resolution of ambiguities might properly be performed by the court itself under the test of *Griffin v. Matherne*, 471 F.2d 911 (5 Cir. 1973).

■ In the case at bar the facts are such that the trial court itself could have properly assumed the task of harmonizing the apparent inconsistency in the jury's treatment of the question of Tepper's negligence. As previously mentioned, the overall tendency of the answers to interrogatories was to exonerate Tepper, and the one answer which may possibly impute negligence was in response to a somewhat ambiguous question. This Court in *Miller v. Royal Netherlands Steamship Co.*, 508 F.2d 1103, 1108 (5 Cir. 1975), said:

"Since [a] logical and probable rationalization of the jury's answers exists the verdict must be accepted. Even though equally persuasive possibilities that would produce reversal might be shown to exist, our own inquiry ends here."

ted when the trial court sent the jury back for further consideration of an inconsistent verdict and counsel made no objection to the procedure. And in *Safeway Stores v. Dial*, 311 F.2d 595 (5 Cir. 1965), this Court held that appellants' failure to object precluded a consideration of resubmission under Rule 49(a). See

Such is the present case. A reasonable view of the interrogatories supports the conclusion that the jury meant 10(c) to indicate that Tepper lost control of his car after colliding with the Bostwick automobile. This permissible resolution was accomplished by the jury through its answer to an additional interrogatory and demonstrated with reasonable certainty that the apparent inconsistency in its verdict was no more than apparent. This procedure was not error and we inquire no further.

## SUFFICIENCY OF THE EVIDENCE

Questions concerning the sufficiency of evidence must be resolved by reference to the oft-quoted standard set out in *Boeing Co. v. Shipman*, 411 F.2d 365, 374, 375 (5 Cir. 1969)(*en banc*), as follows:

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. . . . There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credi-

also, *Truitt v. Travelers Insurance Co.*, 175 F.Supp. 67, 72–73 (S.D.Tex.1959), *aff'd* 280 F.2d 784, 790 (5 Cir. 1960). In the instant case the defendant-appellants made it clear that they felt the inconsistency entitled them to a new trial, so there is no problem of failure to make a timely objection.

bility of witnesses." (Footnote omitted.)[11]

Thus, for purposes of this appeal, we must decide whether there was "substantial evidence" in support of the jury's findings that defendant-appellants Taggart, Frito-Lay, and Bostwick were guilty of negligence which proximately caused the deaths of David Morrison and Max Tepper.

Specifically the jury found that Taggart had a reasonable opportunity to pull the Frito-Lay van completely off the paved highway, and that his failure to do so was a proximate cause of the fatal Tepper-Laughlin collision. (Interrogatory Nos. 5 & 6.) As to Bostwick, the jury found that she was negligent in colliding with the Frito-Lay van and that her negligence directly contributed to the fatal collision. (Interrogatory Nos. 7 & 8.) The jury determined that Tepper collided with the Bostwick Opel but was not guilty of negligence. (Interrogatory Nos. 9, 11 & 14.) In answer to the Supplemental Interrogatory, the jury stated that Tepper lost control of his automobile after colliding with Bostwick. The jury found that neither Tepper nor Laughlin *negligently* crossed the centerline of the highway but was unable to decide by a preponderance of the evidence in which lane the Tepper-Laughlin collision took place. (Interrogatory Nos. 12, 15, 17.)

■■ This Court is of the opinion that there was substantial evidence that Taggart, and consequently Frito-Lay, was guilty of negligence in allowing approximately two feet of the van to protrude onto the paved highway; that is, if Taggart, in the exercise of reasonable care, could have parked the truck completely off the paved

highway, he was under a duty to do so.[12] Although Taggart testified he pulled the truck over as far as he could without overturning it, there was convincing evidence to the contrary, principally photographs showing the shoulders of the highway to be quite wide. Further, the evidence established that after the Bostwick automobile struck the van, the van rolled completely off the highway and did not overturn. We are satisfied there is ample evidence to support the finding that Bostwick was negligent in colliding with the Frito-Lay van.[13] Especially damaging is the deposed testimony of Mrs. Bostwick, herself, which reads as follows:

"Q. Tell us, what was the first thing you saw?

"A. The first thing I recall seeing was a reflector ahead and I thought it was moving forward, and as I got closer, I realized it was not moving at all but by the time I applied my brakes, it was too late.

\* \* \* \* \* \*

"Q. Mrs. Bostwick, why did you not go around the truck?

"A. I couldn't.

"Q. Were there any other oncoming vehicles?

"A. I don't know.

"Q. Were you so close to the truck when you realized it was not moving that you couldn't turn?

"A. Yes, sir." (App. pp. 163, 167.)

■ Appellants Taggart and Frito-Lay argue that the negligence of Bostwick amounted to an independent, intervening cause and that consequently the chain of causation linking them with the fatal colli-

11. *See Bissett v. Ply-Gem Indus., Inc.*, 533 F.2d 142, 146–47 (5 Cir. 1976); *Chapman v. Moser*, 532 F.2d 426, 429 (5 Cir. 1976); *Spurlin v. General Motors Corp.*, 528 F.2d 612 (5 Cir. 1976).

12. Section 63–3–903, Miss. Code of 1972, provides:
    "No person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled part of any highway outside of a

business or residence district when it is practical to stop, park, or so leave such vehicle off such part of said highway. . . ."

13. The thrust of appellant Bostwick's position on appeal is that regardless of her initial negligence, vis-a-vis the collision with the Frito-Lay van, there has been no proof connecting that initial collision with the subsequent Tepper-Laughlin collision. That issue will be addressed at length later in this opinion.

sion of the Laughlin and Tepper automobiles was broken. For their argument to prevail, it is essential that the negligence of Bostwick be found to be unforeseeable. *Canton Broiler Farms, Inc. v. Warren,* 214 So.2d 671, 677 (Miss. 1968).[14] There is no merit in this contention. It was reasonably foreseeable under the circumstances that someone would collide with that portion of the van left protruding onto the highway. In fact, this rationale was the basis for characterizing the act as negligence.

Thus far this Court has held that there was substantial evidence that the combined negligence of the defendant-appellants caused the Bostwick-Taggart collision. Next, we must determine whether there was substantial evidence to support the finding that a Tepper-Bostwick collision occurred and was proximately caused by the Bostwick-Frito-Lay collision.

None of the parties dispute the fact that the Bostwick Opel was involved in at least two accidents and all concede that the first collision was with the Frito-Lay van.[15] However, substantial controversy surrounds the second accident. The defendant-appellants argue that an unidentified fifth vehicle collided with the Bostwick Opel shortly after the fatal Tepper-Laughlin, accident. Taggart testified that, just after he got out of the van following the Tepper-Laughlin collision, he saw a light-colored northbound car skid into the left rear of the Opel. (App. 108–11, 137, 569, 610.) Taggart stat-

ed that the impact was "light" (App. 110, 612.) He could not, however, recall the direction the Opel was facing or if its position on the highway was altered as a result of this collision.[16] (App. 592, 594.) Taggart's account of a mysterious fifth vehicle striking the Bostwick Opel is bolstered by the testimony of Officer Prevost, who testified that an unidentified man told him that he had run into the Opel. (App. 429.) Prevost also testified that Mrs. Bostwick, while in the hospital, told him that her car was struck on the left rear after the Tepper-Laughlin collision. (App. 447.)[17]

The plaintiff-appellees contend that there was ample circumstantial evidence to rebut the preceding testimony of Taggart and Prevost, and to warrant submission of the question to the jury. They argue that the testimony of Air Force Safety Technician Hawkins leads to the reasonable inference that a collision between the Tepper and Bostwick automobiles occurred. (App. 190–91.) However, the crux of their argument lies in the testimony of W.E. Hodgins and Ernest E. Bailey, chemists from the Mississippi State Chemical Laboratory, concerning paint samples taken from the Bostwick Opel and Tepper's Pontiac. (App. 315–359.) Hodgins testified that he removed paint scrapings from the two automobiles. In particular he stated he removed samples of "foreign paint" from the impact area of the left rear fender of the Opel automobile. (App. 317–18.) Bailey testified that he con-

14. The jury was not requested squarely to address the issue of foreseeability, but a construction that the negligence of Mrs. Bostwick was foreseeable seems implicit in the jury's verdict that the negligence of both Bostwick and Taggart was a proximate cause of the Tepper-Laughlin collision.

15. Officer Prevost testified that the Opel had been damaged by two collisions, one on each side of the car. (R. 541.) Photographic evidence supported his testimony and tended to establish that one collision damaged the right front of the Opel and the other collision damaged the left rear.

16. Prevost testified that, when he arrived on the scene of the accident, the Bostwick automobile was located in the center of the highway facing south. If the Opel was so situated

at the time of this alleged collision, it would have been most difficult for the northbound mystery car to have damaged the left rear of the Opel. Of course, it is possible that the Opel was sitting on the highway at an angle which would have facilitated such a collision.

17. The testimony of Mrs. Bostwick by deposition does not support Prevost on this point:

"Q. When did your memory return to you [following the collision with the Frito-Lay van]?

"A. Everything was very confused and very foggy. I remember being in the hospital emergency room.

"Q. That is when your memory came back?

"A. That is when I recall things." (App. 172–73.)

ducted various tests seeking to identify the paint samples in question. As a result of these tests, Bailey concluded that the sample of foreign paint taken from the left rear of the Opel was "identical" with that taken from the Pontiac. (App. 347.) As to the foreign paint taken from the Pontiac, Bailey stated that it was "similar" to the paint sample taken from the Opel but he could not say that it was identical. (App. 352.)

*Boeing Co. v. Shipman, supra,* advises us to review the evidence in the light most favorable to the jury's verdict. The testimony of the chemist Bailey furnished substantial evidence that Bostwick's Opel and Tepper's Pontiac did collide, and to so find was within the province of the jury.

Having found that substantial evidence supports the jury's determination that the Bostwick and Tepper automobiles collided, we inquire whether there was substantial evidence that the collision was caused by the concurrent negligence of the defendant-appellants. The evidence of the skid marks tends to establish that if the Tepper automobile struck the Bostwick vehicle, it did so when the latter had intruded into the northbound lane.[18] This view of the evidence is supported by the final location of the Bostwick automobile in the center of the highway and by the fact that it was damaged in the left rear. Since the parties do not dispute that Tepper was traveling north on Highway 373,[19] the jury could have reasonably concluded that the accident was caused by the presence of the Bostwick vehicle in Tepper's proper lane. A reasonable inference from the evidence is that the Opel was in the wrong lane because it was carried there by the force of its collision with the Frito-Lay van.[20] Since

there was no evidence of negligence on the part of Tepper, we find that substantial evidence points to the initial negligence of Bostwick and Taggart as a cause of the Bostwick-Tepper collision.

Lastly, we inquire as to whether there is substantial evidence of a causal connection between the Bostwick-Taggart (Frito-Lay) collision and the tragic Tepper-Laughlin collision. The fact that the two collisions occurred within close proximity of one another both in time[21] and in space is relevant evidence of causal connection. If something more is needed to satisfy the substantial evidence criteria of *Boeing*, that something extra may be supplied by the substantial evidence of a Bostwick-Tepper collision, and by evidence indicating that Tepper lost control of his automobile following the Bostwick collision and that he was never able to regain control. Patrolman Prevost testified that skid marks commenced at the extreme righthand side of the north lane at the rear of the Opel and continued "twenty-five steps" or seventy-five feet down the same lane of traffic gradually heading to the left and terminating, in a gouge mark in the north lane. While Air Force Safety Technician Hawkins gave a substantially different account of the facts, he too indicated that the evidence suggested that Tepper lost control of his car as a result of the Bostwick automobile being in the northbound lane of traffic. Hawkins testified that the northbound car which made the skid marks went off the road to the right, swerved back onto the road, and was eventually involved in a collision which left marks in the southbound lane of the highway. Thus in conclusion we find that there was substantial evidence: that a Tepper-Bostwick collision occurred as

---

**18.** App. 204, 410, 794. The skid marks were never positively identified as belonging to the Tepper Pontiac. However, the strong inference is that they must have been made by the Pontiac since it was the only car traveling northward to pass the Bostwick Opel. The unidentified fifth vehicle did not proceed northward beyond the Opel prior to officer Prevost's investigation. (App. 90, 110, 428.)

**19.** *See, e.g.,* App. p. 292.

**20.** Another explanation under the circumstances would be a volitional act of Bostwick, but she stated that she was rendered unconscious by the first collision. (App. 172–73.)

**21.** Taggart testified he heard a second collision while the truck was still rolling. (App. 613.)

a result of the concurrent negligence of Bostwick and Taggart; that this collision caused Tepper to lose control of his automobile; and that this loss of control caused the tragic Tepper-Laughlin collision.[22]

Regarding the judgment n.o.v. disallowing the jury's award of $25,000 for the pain and suffering of David Morrison, this Court is of the opinion the district court erred. The evidence shows Morrison did live at least three hours after receiving his injuries. Highway Patrolman Prevost testified that he attempted to talk with Morrison at the hospital shortly after the accident; that Morrison was conscious and appeared to be suffering (App. 424, 426). The testimony of Patrolman Prevost was the only evidence introduced as to the pain and suffering of David Morrison. This evidence, standing alone, is of the requisite "quality and weight" envisioned by *Boeing*, *supra*, 411 F.2d at 374. The judgment n.o.v. disallowing the award of $25,000 for pain and suffering of Morrison is set aside.

This Court after careful examination concludes that there was substantial evidence to support the jury verdict. We further hold that the district court did not err in its handling of the Rule 49(a) questions. Judgment should be rendered in accordance with the jury verdict. Costs of appeals are taxed against the defendants-appellants Frito-Lay, Taggart and Bostwick.

AFFIRMED IN PART AND REVERSED IN PART.

GEE, Circuit Judge, concurring in part and dissenting in part:

I concur in Judge Rives' lucid and scholarly opinion in this close and troubling cause, except for its reversal of the trial court's modest judgment non obstante. It is fair to say that many of the jury's findings rest on evidence which is thin and that some of the inferences drawn by it approach conjecture and speculation. Notwithstanding, I conclude with the majority that in all respects but this the line is not crossed. With the award for Mr. Morrison's pain and suffering, however, the evidence seems to me to dwindle to a scintilla; and I would defer to the judgment of the trial court, which heard officer Prevost's testimony.

---

22. The jury found that the Tepper-Laughlin collision was proximately caused by the negligence of both Taggart and Bostwick, and that neither Tepper nor Laughlin was culpable. Specifically, the jury found that neither driver "negligently drove his automobile over the centerline of the highway . . . ." The appellants attach particular significance to the fact that the jury was unable to decide by a preponderance of the evidence the lane in which the Tepper-Laughlin collision took place, but we are of the opinion that a decision of this question is not dispositive of the case.

There was conflict in the only direct evidence as to the lane in which the collision occurred. Highway Patrolman Prevost testified that there was a gouge mark in the northbound lane of the highway and Air Force Safety Technician Hawkins located the gouge mark in the southbound lane. Further, a finding that the accident occurred in a particular lane would not impute negligence to either Tepper or Laughlin. There was ample evidence that Tepper lost control of his car after colliding with Bostwick and that he was unable to regain control in the 75 to 130 feet between the two accidents. Thus, Tepper would not be liable for crossing the centerline of the highway. As to Laughlin it is apparent that he was confronted with an emergency situation—the Tepper Pontiac headed in his direction, the Frito-Lay van off to the right of the highway ahead and the Bostwick Opel in the middle of the highway ahead. Under these circumstances, there was substantial evidence that neither Tepper nor Laughlin was culpable, regardless of who crossed the centerline.