**ARMCO INDUSTRIAL CREDIT CORPORATION, Plaintiff-Appellee,**

v.

**SLT WAREHOUSE COMPANY, and Richard B. Conklin, Defendants-Appellants.**

No. 84–1828.

United States Court of Appeals, Fifth Circuit.

Feb. 7, 1986.

Rehearing and Rehearing En Banc Denied March 19, 1986.

Matthews & Thorp, Howard Jensen, John D. Exline, Dallas, Tex., William G. Guerri, St. Louis, Mo., Stephen G. Anderson, Washington, D.C., for SLT Warehouse.

Ewing Adams, Longview, Tex., for Conklin.

Aden L. Vickers, Dallas, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, BROWN and GEE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

The defendants SLT Warehouse Co. and Richard Conklin appeal from a $2 million RICO judgment that was based on losses sustained by the plaintiff in extending credit to a now-defunct oilfield supply company. In a nutshell, the case turns on the actions or nonactions of Conklin. The verdict in the trial court was based upon the jury's apparent conclusion that Conklin's knowledge of a fraud perpetrated on the plaintiff by third parties and his failure to alert the plaintiff constituted aiding and abetting the fraud. The jury also apparently determined that Conklin's knowledge and failure to warn could be imputed to his employer SLT under agency principles for purposes of finding that SLT aided and abetted the fraud. Because we find that the evidence was insufficient to find Conklin liable for aiding and abetting the fraud, we reverse the judgment against both defendants.

*A Baleful Tale of Creative Financing*

This case arises out of a simple fraud set against the background of the economic

downturn in the oilfield supply business in the early 1980s. The parties have painted somewhat different pictures of the facts of this case, but the essential facts are undisputed.

There are three companies involved in this drama. The first of these is Pritchett and Company (Pritchett), a now-defunct oilfield supply manufacturer located in Longview, Texas. Guy Pritchett served as president of Pritchett and Co., and Robert Rigby served as treasurer.

Armco Industrial Credit Corporation (Armco) is a commercial lender who, at the time of this case, was seeking to expand its fledgling asset-based lending business. On March 17, 1981, Armco and Pritchett entered into a loan and security agreement under which Armco would advance to Pritchett up to 85% of the value of Pritchett's inventory. By this agreement, Armco acquired a security interest in Pritchett's accounts receivable and inventory to secure its loans.

The procedure under which Armco advanced money to Pritchett worked as follows. Approximately once a day, Rigby would prepare a schedule of Pritchett's accounts receivables supported by invoices to Pritchett's customers and would forward this schedule to Armco. Armco would compute the line of credit available to Pritchett and would wire these funds to Pritchett's bank in Longview. When Pritchett was paid by its customers, it initially forwarded those checks to Armco in repayment of Armco's loan, but later, without objection from Armco, Pritchett increasingly repaid Armco's loan with checks drawn on Pritchett's own account.

As part of their financing agreement, Armco and Pritchett also entered into a three-party "Inventory Certification Agreement" with SLT Warehouse Co. (SLT), a national "field warehouse" or "collateral control" company. These companies give lenders safeguard protection on inventory financing; essentially they are third-party watchdogs over the debtor's inventory. In the three-party agreement, SLT's duties were described as follows:

(a) to supervise the installation and maintenance of records and procedures required for the control of inventory to be covered by SLT's Inventory Certification Service.

(b) to supervise and participate in the taking of a beginning inventory, and to deliver to [Armco] its Inventory Certificates certifying to value of inventory in [Pritchett's] premises, calculated at values designated or approved by [Armco] on inventory described by [Armco] as being the subject of [Armco's] interest; and subsequently to furnish to [Armco] its Inventory Certificates, at regular intervals, to be agreed upon between [Armco] and SLT.

(c) to comply with instructions which SLT has accepted or will accept hereafter from [Armco], setting out the conditions under which Company may remove inventory subject to [Armco's] interest, and to allow no further removal of inventory from the premises by Company, when such limitation as provided by [Armco's] instructions has been reached.

(d) SLT shall be liable to [Armco] for any loss [Armco] may suffer as a result of reliance upon SLT's Inventory Certificates, not in excess of the value authorized by [Armco], to the extent of any deficiency of inventory then outstanding on Inventory Certificates subject to deliveries made pursuant to [Armco's] delivery authorizations, or arising out of any failure by SLT to perform its obligations as set forth in this paragraph.

(e) to send to [Armco] a copy of SLT's monthly statement of its account with [Pritchett].[1]

In the three-party agreement, however, SLT contracted only to certify the dollar amount of Pritchett's inventory according to stipulated cost values; it did not contract to verify or certify any of Pritchett's receivables which formed the bulk of the collateral for Armco's loans.

---

1. R.Vol. II at 483.

In implementing the agreement between Pritchett, Armco, and SLT, a Pritchett employee named Richard Conklin was transferred from Pritchett's payroll to SLT's payroll. Conklin was to serve as SLT's agent in Longview, supervising the inventory certification program for the Pritchett/Armco loan agreement. Three other Pritchett employees, Kelly Allen, Jimmy McGrede, and Linda Vick, also were transferred to SLT's payroll at various times to assist in the inventory certification.

Conklin was put on SLT's payroll to prepare weekly inventory certificates to assure Armco that Pritchett's inventory would not fall below a minimum dollar "hold figure" value. Since taking frequent physical counts of inventories that turn over rapidly is impractical if not impossible, Conklin employed the standard procedure of measuring the additions to and shipments out of inventory and adding or subtracting this net difference from a "beginning" inventory figure. As part of this calculation, Conklin deducted the quantities of various inventory items listed on invoices of actual shipments from the previous week's inventory amounts.

In mid-1981, several months after the Armco/Pritchett arrangement was initiated, the oilfield supply industry began to experience a steep downturn in orders, reflecting falling oil prices and the contraction of the national economy. Pritchett also began to experience cash flow problems, having elected to expand its product line before the downturn became apparent. About this time, Guy Pritchett and Robert Rigby, and possibly other members of Pritchett's management, elected to solve their temporary cash flow problem by submitting phony invoices to Armco. Armco did not discover the fraud and advanced money against the bogus invoices.

As Pritchett's economic position continued to worsen, Pritchett increasingly was forced to rely on its bogus invoice scheme to obtain necessary operating funds from Armco. These phony accounts receivable represented increasingly greater propor-

tions of the schedule of accounts receivable submitted to Armco. For example, in December 1981, Pritchett reported to Armco that it invoiced four customers for 59 shipments in the sum of $5,603,317.23. For the same period, Conklin certified actual shipments from Pritchett's main inventory in Longview in the amount of only $360,877.07. The comparable figures for February 1982 were $10,658,725.25 and $274,387.05, respectively.

Conklin became aware that Pritchett was generating phony invoices some time in the second half of 1981 when he noticed that certain invoice numbers were missing from the information which Pritchett provided to him for his inventory certification responsibilities. Concerned that he might be overlooking something, Conklin asked Pritchett management about the missing invoices and was initially told that the missing invoices represented "drop shipments," i.e., Pritchett-brokered shipments that were shipped from Pritchett's suppliers directly to its customers without passing through Pritchett's inventory.

Later, when this explanation failed to assuage Conklin, he inquired further and was told that all of the invoices which pertained to his inventory control job were being passed to him, and that any invoices which he did not have did not pertain to his job. Conklin apparently made no further inquiries, but he was able to deduce the essential features of Pritchett's scheme from his knowledge of Pritchett's operations and the trickle of sales out of inventory of which he had firsthand knowledge.

About the time that Conklin discovered the existence of the missing invoice numbers and learned that bogus invoices were being generated, Pritchett management began to pass some if not all of the bogus invoices to Conklin along with the invoices that represented actual sales. Conklin knew that the bogus invoices did not represent actual shipments from inventory so he segregated the genuine and bogus invoices and used only the genuine invoices for his inventory certification calculations. It is undisputed that by omitting the bogus in-

voices from his calculations, Conklin prepared certificates that accurately reflected Pritchett's actual inventory for the duration of the Armco/Pritchett/SLT agreement. When an annual physical inventory was taken, Conklin's inventory value was corroborated nearly to the dollar.

Pritchett's scheme to obtain operating funds was able to continue undetected until the spring of 1982 for several reasons. First, by allowing Pritchett to repay its loans with checks drawn on Pritchett's own account, Armco lost its most effective method of insuring that it was not being repaid with its own advances. Second, Armco failed to investigate adequately the discrepancy between the inflated schedule of accounts receivable which it received from Pritchett and the trickle of shipments from inventory shown on Conklin's inventory certificates. Armco made only a few general inquiries and readily accepted Rigby's explanation that the discrepancy was due either to "drop shipments" that were shipped from Pritchett's suppliers directly to its customers without passing through Pritchett's inventory, or to temporary build-ups in inventory pending completion of certain manufacturing processes needed to meet American Petroleum Institute specifications. Third, Guy Pritchett was able to convince several of his customers to falsely confirm or at least not deny to Armco's auditors that Pritchett's bogus invoices represented actual sales. Finally, although Conklin knew something was amiss, he did nothing to alert either SLT or Armco to the fact that Pritchett was generating phony invoices.

In fact, Armco of its own accord never did discover the fraud. In early 1982, Pritchett requested a significant increase in its credit line, and Armco began to investigate the creditworthiness of Pritchett's largest purported accounts before granting the request. When that information was slow in forthcoming, Armco reduced the amount of money it was advancing to Pritchett and Pritchett's checks began to bounce. Finally, in late March 1982, Guy Pritchett suddenly confessed to one of Armco's auditors that Pritchett had submitted several phony invoices to Armco.

After Armco investigated and discovered the full extent of the fraud, it ceased its loans and foreclosed on Pritchett's inventory. All told, Pritchett submitted approximately $43 million of invoices to Armco, of which about $37 million were bogus.[2] After initially cooperating with Armco, Guy Pritchett, who had personally guaranteed repayment of Armco's loans, declared bankruptcy and has invoked the Fifth Amendment in refusing to cooperate with Armco's subsequent investigations.

Armco brought the present action against Robert Rigby, Richard Conklin, and SLT to recover the unpaid monies that it had advanced to Pritchett. Armco included in its complaint counts alleging a RICO violation, fraud, breach of contract, and breach of warranty. At the close of the evidence, the judge submitted the case to the jury on a set of special interrogatories.[3] The jury returned a verdict for Armco on all counts, but awarded damages only on the RICO count in the amount of $618,000. The trial judge trebled this amount and added $213,000 for attorneys' fees for a total judgment of $2,067,000. SLT and Conklin[4] now appeal.

### SLT's Laundry List

SLT raises numerous issues on appeal. Specifically, it contends that the District Court erred in:

1. Denying SLT's motion for a directed verdict

---

**2.** Because Pritchett largely repaid Armco's earlier loans with the proceeds obtained from new pledges of accounts, Armco's actual losses amounted to only a fraction of the $37 million that it advanced against Pritchett's phony invoices.

**3.** F.R.Civ.P. 49(a).

**4.** For purposes of this appeal, Conklin had adopted the arguments put forth in SLT's brief and raised by SLT in oral argument. Therefore, for the remainder of this opinion, we shall refer to the appellants in the singular as SLT except where it is necessary to distinguish them.

a) on the RICO count for Armco's failure to allege or prove a prior criminal conviction of the RICO predicate acts;

b) on the RICO count for Armco's failure to allege a discrete racketeering enterprise injury;

c) on the insufficiency of the evidence;

2. Jury instructions

a) refusing to instruct the jury that Armco could be injured within the meaning of the RICO statute only if it justifiably relied to its detriment on the fraudulent statements comprising the predicate act mail fraud violations;

b) refusing to instruct the jury that criminal conduct by Conklin could be imputed to SLT only if the criminal act committed by Conklin was done for SLT's benefit;

c) refusing to instruct the jury regarding the meaning of "aiding and abetting";

d)(i) giving an instruction on apparent authority;

(ii) refusing to charge that Conklin was a dual agent;

(iii) refusing to submit to the jury a special interrogatory regarding whether Conklin acted within the scope of his employment;

3. Refusing to order a new trial on the grounds that the jury verdict is in irreconcilable conflict.

While we find the majority of these contentions to be without merit, we reverse the District Court because we find the evidence supporting Armco's judgment to be insufficient. We shall address SLT's contentions below generally in reverse order of their merit.

### 1(a), 1(b) Getting Richer with RICO

The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, provides plaintiffs with a private civil action to recover treble damages for injury "by reason of a violation of [18 U.S.C.] section 1962." 18 U.S.C. § 1964(c). Among the activities that constitute violations of § 1962 is the conducting of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c). RICO defines "racketeering activity" to include, among others, any act "indictable" under numerous federal criminal provisions, including mail and wire fraud (so-called "predicate acts"). 18 U.S.C. § 1961(1)(B). A "pattern of racketeering activity" is defined as two or more "acts of racketeering" occurring within ten years of each other, with at least one of those acts occurring after the passage of the act. 18 U.S.C. § 1961(5).

SLT advances a number of contentions attacking the manner in which Armco's RICO claims were presented to the jury. Specifically, SLT challenges the District Court's failure to direct a verdict for SLT on the RICO count for Armco's failure to allege or prove either a prior criminal conviction of the predicate acts or a discrete racketeering enterprise injury. Also, although not enumerated as a separate alleged point of error, SLT questions the jury instruction that the predicate acts need have been proved only by a civil "preponderance of the evidence" standard, not by the criminal "beyond a reasonable doubt" standard.

SLT's RICO arguments in this case derive directly from the Second Circuit's opinion in *Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482 (2d Cir.1984). In that case, the Court considered the RICO statute in the context of a business fraud case and held in a 2–1 decision that a RICO plaintiff must allege a racketeering injury distinct from the injuries caused by the predicate acts, *id.* at 494, and that criminal convictions on the underlying predicate offenses must be shown, *id.* at 496.

We might be more receptive to SLT's contentions had the Supreme Court not spoken since this appeal was briefed. In *Sedima, S.P.R.L. v. Imrex Co.*, —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Court reversed the Second Circuit, foreclosing each of SLT's arguments.

[W]e can find no support in the statute's history, its language, or considerations of policy for a requirement that a private treble damages action under

§ 1964(c) can proceed only against a defendant who has already been criminally convicted. To the contrary, every indication is that no such requirement exists. Accordingly, the fact that Imrex and the individual defendants have not been convicted under RICO or the federal mail and wire fraud statutes does not bar [the plaintiff's] action.

— U.S. at ——, 105 S.Ct. at 3284, 87 L.Ed.2d at 357.

[W]e perceive no distinct "racketeering injury" requirement. Given that "racketeering activity" consists of no more and no less than commission of a predicate act, § 1961(1), we are initially doubtful about a requirement of a "racketeering injury" separate from the harm from the predicate acts. A reading of the statute belies any such requirement. Section 1964(c) authorizes a private suit by "[a]ny person injured in his business or property by reason of a violation of § 1962." Section 1962 in turn makes it unlawful for "any person"—not just mobsters—to use money derived from a pattern of racketeering activity to invest in an enterprise, to acquire control of an enterprise through a pattern of racketeering activity, or to conduct an enterprise through a pattern of racketeering activity. §§ 1962(a)–(c). If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement.

Id. at ——, 105 S.Ct. at 3285–86, 87 L.Ed.2d at 358 (footnote omitted). See also Howell Petroleum Corp. v. Weaver, 776 F.2d 1302 (5th Cir.1985).

Furthermore, the Court strongly suggested, although it declined to hold, that the predicate acts need not be proven according to a criminal "beyond a reasonable doubt" standard, but only according to the civil "preponderance of the evidence" standard. Since the Court did not view the prior conviction and standard of proof issues as "close to the constitutional edge," we are reluctant to inject another judicial construct into a statute that we are commanded to construe broadly.

For those who lament that a broadly and vaguely drafted statute has been turned to uses unintended and probably unwanted by its original sponsors, the Court did suggest that the significance of RICO's "pattern of racketeering activity" language may remain an open question. See —— U.S. at ——, 105 S.Ct. at 3287, 87 L.Ed.2d at 361 ("[t]he question[ ] ... whether the commission of those [predicate] acts fell into a pattern ... [is] not before us"); id. at ——, 105 S.Ct. at 3285 n. 14, 87 L.Ed.2d at 358 n. 14; see also Powell J., dissenting; cf. R.A. G.S. Couture, Inc. v. Hyatt, 774 F.2d 1350 (5th Cir.1985). Since the parties before us have not raised the issue, however, we leave for the future the task of interpreting that phrase.

### 2(a) Relying on the Mails

SLT also challenges the judge's refusal to instruct the jury that Armco could be injured within meaning of the RICO statute only if it justifiably relied to its detriment on the fraudulent statements comprising the predicate act mail fraud violation. SLT argues that the misrepresentations underlying the RICO mail fraud violations cannot be deemed the proximate cause of Armco's loss because Armco was not justified, i.e., was negligent, in relying upon them. SLT questions the apparent anomaly that if justifiable reliance is not required under the RICO count, then treble damages are more easily recovered under RICO than are simple damages under fraud.

By confusing mail fraud with common law fraud, SLT's argument falls wide of the mark. Armco contends that violations of the federal mail fraud statute, 18 U.S.C. § 1341, comprise the predicate acts upon which SLT's RICO liability is founded. Establishing a mail fraud violation requires proof of three elements: (1) the defendant participated in some scheme or artifice to defraud, (2) the defendant or

someone associated with the scheme used the mails or "caused" the mails to be used, and (3) the use of the mails was for the purpose of executing the scheme. *United States v. Davis,* 752 F.2d 963, 970 (5th Cir.1985). To find a violation of the federal mail fraud statute it is not necessary that the victim have detrimentally relied on the mailed misrepresentations. *United States v. Goldberg,* 455 F.2d 479, 481 (9th Cir.), *cert. denied,* 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 665 (1972). Indeed, the intended victim need not even have been defrauded for liability to attach under the mail fraud statute. *United States v. Buchanan,* 633 F.2d 423, 427 (5th Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 301 (1981). The trial judge correctly refused to give an incorrect instruction.

### 3 Reconciling the Irreconcilable

■■■ SLT contends that the trial judge erred in refusing to order a new trial on the grounds that the jury's verdict is in irreconcilable conflict. The jury found that SLT violated the RICO statute, committed common law fraud, breached its contract with Armco, and breached its express warranties to Armco. However, the jury found that no damages to Armco were proximately caused by the defendants' fraud, breach of contract, or breach of warranty. Only with respect to the RICO violation did the jury find that the defendants' actions had proximately caused damages to Armco.[5] SLT apparently contends that

since all of Armco's alleged damages arise from the same facts, since the jury found for Armco on all counts, and since the court's charge regarding damages under the different legal theories was identical, the jury could not have found damages on the RICO count while finding no damages on the other counts.

A reviewing court is under a constitutional mandate to search for a view of the case that makes the jury's answers consistent. *Atlantic & Gulf Stevedores v. Ellerman Lines,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798, 806–07 (1962); *R.B. Co. v. Aetna Ins. Co.,* 299 F.2d 753, 759 (5th Cir.1962). We have reviewed the record and we are unconvinced that the jury's verdict is in irreconcilable conflict. The most logical explanation is that the verdict was the result of the trial judge's instructions regarding justifiable reliance.

As mentioned above, justifiable reliance is not an element that need be proven to establish a mail fraud violation. The trial judge therefore correctly instructed the jury when he omitted mention of justifiable reliance from his RICO instructions. With respect to the fraud contracts and warranty claims claims, however, the jury was instructed that Armco must prove that it justifiably relied on the fraudulent statements and that it sought to mitigate its damages under the breach of contract and the breach of warranty claims.[6] Thus, if the jury credited SLT's extensive evidence

---

5. The presentation of the issues to the jury in special verdict form provides a reviewing court with the information necessary to identify the *sources of liability and possible error.* We again commend the use of special verdicts. *See* Brown, "Federal Special Verdicts: The Doubt Eliminator," 44 F.R.D. 338 (1967).

6. The court's charge to the jury on the fraud count included the following language.

Armco must prove that it justifiably relied and acted upon the false representation or concealment. If, in the exercise of reasonable care for the protection of its own interests, Armco could have ascertained the truth of the matter by making a reasonable inquiry or investigation under the circumstances presented, but failed to do so, then it cannot be said that Armco's reliance was "justifiable".

The court's charge to the jury on the contract and warranty counts included the following language.

You are instructed that any person who claims damages as a result of an alleged breach of contract or breach of warranty on the part of another has a duty under the law to "mitigate" those damages—that is, to take advantage of any reasonable opportunity he may have under the circumstances to reduce or minimize the loss or damage.

So, if you should find from a preponderance of the evidence that the Plaintiff failed to seek out or take advantage of an opportunity that was reasonably available to it to mitigate its damages, then you should reduce the amount of its damages by the amount it could have reasonably realized if it had taken advantage of such opportunity.

concerning Armco's negligence in administering the loans to Pritchett, it easily could have determined that the damages suffered by Armco under the fraud, contract, and warranty claims were not recoverable because of Armco's unjustified reliance and failure to mitigate.

### 2(d) Instructing the Jury

SLT also complains about various other omissions and inclusions in the trial judge's charge to the jury. Specifically, SLT contends that the trial judge erred (i) in giving an instruction on apparent authority, (ii) in refusing to charge that Conklin was a dual agent, and (iii) in refusing to submit a special interrogatory concerning whether Conklin acted within the scope of his employment.

■ We first observe that the District Court has wide discretion as to the form of the special interrogatories used in a special verdict. F.R.Civ.P. 49(a), *Dobbs v. Gulf Oil Co.*, 759 F.2d 1213, 1215 n. 3 (5th Cir.1985). The instructions need not be perfect in every respect provided that the charge in general correctly instructs the jury, and any error resulting from the erroneous instruction is harmless. *McNeese v. Reading & Bates Drilling Co.*, 749 F.2d 270, 274 (5th Cir.1985). If, considered as a whole, the instructions are comprehensive, balanced, fundamentally accurate, and not likely to confuse or mislead the jury, the charge will be deemed adequate. *In re Corrugated Container Antitrust Litigation*, 756 F.2d 411, 417 (5th Cir.1985).

Our review of the record does not convince us that the trial judge's instructions on apparent authority and his refusal to charge on dual agency or scope of employment constituted an abuse of discretion or error. The judge's instruction on apparent authority was a correct statement of the law. An instruction on dual agency or scope of employment would have added nothing to the 30-page charge that was submitted, and its inclusion only would have muddied the waters in an already complicated trial. The charge given accurately summarized the pertinent legal issues and the substantive law. Hence we find no error.

### 1(c), 2(b), 2(c) Contracting for Criminal Liability

■ This brings us to SLT's remaining contentions involving the sufficiency of the evidence, the meaning of "aiding and abetting," and the standard for imputing Conklin's conduct to SLT. Because these issues are somewhat intertwined, we shall consider them in the same discussion.

Armco's amended complaint and its proof at trial outline the theory of its case against Conklin and SLT and can be summarized as follows. After Conklin discovered the accounts receivable fraud, he, as SLT's agent, owed Armco a contractual duty to alert Armco to the fraud. His failure to do so aided and abetted the fraud and made him liable as if he were a principal to the fraud. As SLT's agent, Conklin acted within the scope of his authority and thus his conduct can be imputed to SLT, making SLT also liable as an aider and abetter. Conklin's and SLT's aiding and abetting liability gave rise to the predicate act mail fraud contract and warranty claims violations which triggered Conklin's and SLT's RICO liability.

Thus, Armco's case depends on establishing certain links in the chain of liability. First, Conklin must have violated the mail fraud statute, at least as an aider and abetter if not as a principal, and second, Conklin's asserted criminal conduct must be imputed to SLT. We hold that there is insufficient evidence in the record to support the first of these critical propositions. Because our rejection of the first proposition is decisive in justifying vacating the judgment against both Armco and SLT, we need not address the second proposition. To the extent that the jury found that Conklin violated the mail fraud statute, we consider those findings to be without sufficient support in the record, thus requiring an instructed verdict or j.n.o.v. on the RICO claim. *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc).

Armco has alleged that once Conklin discovered the nature of Pritchett's accounts

receivable fraud, he "consented to the scheme and thereafter participated in the plan and scheme to defraud Armco." Consistent with its pleadings, Armco presented evidence at trial attempting to show that Conklin participated in the mail fraud as both a principal and an aider and abetter.

We emphasize first that there is no evidence that Conklin participated in the fraud as a principal. On appeal, Armco has tried to point to evidence in the depositions of Kelly Allen and Ken Yarbrough which were read at trial showing that Conklin actively participated in the fraud, but its contentions are completely unsupported by the record, even under a "preponderance of the evidence" standard.

Kelly Allen was one of SLT's "subagents," and, like Conklin, a former Pritchett employee. Armco asserts that Conklin obtained the signature of Allen on various bills of lading covering bogus shipments. Signatures on legitimate bills of lading ordinarily would have been signed by Pritchett's customers' truck drivers, and Allen's signing the bogus bills of lading made it appear that the goods covered by the invoices had been picked up by the customer when in fact the "shipments" never existed. If this was the testimony, it might constitute some evidence that Conklin was an active participant in the fraud.

The portion of the transcript cited by Armco, however, reveals that Allen's testimony is at best ambiguous regarding Conklin's solicitation of Allen's signature on a bogus bill of lading.[7] Allen indicates that although Conklin occasionally asked Allen to prepare a shipment for delivery, it was Rigby who asked Allen to sign documents indicating that a nonexistent "shipment" had been picked up or delivered. Any ambiguity about Conklin's participation is clearly resolved by a later portion of the deposition which was introduced by the defense in which Allen flatly denied that Conklin ever asked him to sign a bogus bill of lading.[8]

Armco asserts that Conklin also obtained the signature of Ken Yarbrough, one of Pritchett's truck drivers, on bogus bills of lading in order to reflect the "delivery" of goods not actually ordered by Pritchett's customers. Again, Armco is playing a bit fast and loose with the deposition testimony read at trial.

Yarbrough testified that he was often asked by Gloria Bennett, a Pritchett employee, to sign various papers which turned out to be blank bills of lading. He also testified that he dealt with Conklin in Conklin's capacity as inventory supervisor with respect to the legitimate shipments that he picked up for delivery. He testified further that "everybody in the world" has requested him to go see Bennett at various times. But Yarbrough never testified that Conklin asked him to go see Bennett to

---

7.  Q:  Do you recall who asked you to sign [the bill of lading] and how you came to sign it?
    Allen: Sometimes it would be Mike Prichett because he would make the sale to Buddy Warr, which was the president of Warr Enterprises. And it would be either him or Rich Conklin that would tell me that Buddy is coming over, you need to load the truck up with this, I've got it laid out. And they would have a bill of lading all worked up for me.

    .    .    .    .    .

    Q:  Why didn't you get the signature of the person with Warr Enterprises showing they had received the inventory?
    Allen: I wasn't asked to.
    Q:  Isn't that normally what would happen if you had loaded a truck up and got Warr Enterprises or someone like that, if they were receiving goods?
    Allen: Yes, sir.

Q:  So, this was unusual for you to sign on it?
Allen: Uh-huh, sure was. Sometimes if they had it and there was numerous occasions when Bob Rigby would come outside and tell me, "I didn't get so-and so's signature. You are going to have to sign this because I can't run it through." And I would have to sign them.
Transcript, p. 332.

8.  Q:  Okay. So, they would come and tell you that something had already been picked up, but they wanted you to sign [the bill of lading]?
    Allen: Correct.
    Q:  You mentioned Mr. Rigby?
    Allen: Yes, sir.
    Q:  What about anyone else? Did Mr. Conklin ever ask you to do that in that instance?
    Allen: Mr. Conklin never did.
Transcript, pp. 340–41.

sign a bogus bill of lading, or that Conklin himself asked Yarbrough to sign a bogus bill of lading.

Armco further argues that Conklin affirmatively participated as a principal in the scheme to defraud Armco by segregating the bogus invoices and then omitting them from his inventory certification calculations and documentation.[9] While Conklin admitted that he did segregate such invoices and omit them from his calculations, we cannot accept Armco's argument.

Conklin was hired to prepare accurate weekly inventory certificates that would enable Armco to be certain that Pritchett's inventory would not fall below the minimum "hold figure" value set by Armco. If Conklin had included the bogus invoices in his calculations, those calculations quickly would have shown the value of inventory dipping to zero and beyond. This phenomenon clearly would have alerted Armco to a problem, if anyone at Armco had taken the time to review the certificates and their documentation.

But Conklin's duty to SLT was to calculate and certify the value of Pritchett's inventory, and it is undisputed that he accurately performed that duty. If Conklin had included the bogus invoices in his calculations, as Armco now asserts that he should have, he would have submitted an inventory certificate he knew to be false. That would have violated his duty to SLT and SLT's contractual duty to Armco. It is more than a bit disingenuous for Armco to insist that Conklin should have violated his inventory certification responsibilities to SLT and Armco in order to give Armco an indirect hint of potential problems with the receivables at Pritchett.

In contrast to this complete lack of evidence of Conklin's participation, there is uncontradicted evidence that Conklin had nothing to do with the mailing of the bogus invoices, which were the instruments of the fraud. In a statement taken by Arthur Paone, Armco's general counsel, just as the fraud was being discovered and long be-fore this suit was filed, Guy Pritchett stated that Conklin did not participate in the fraud and that Pritchett management had tried to keep details of the scheme from Conklin as well as from Pritchett employees. In a similar statement taken of Conklin at about the same time, Conklin stated that when he asked questions of Rigby and Pritchett, he was assured that everything was all right and "not to worry about it." In Rigby's deposition introduced at trial, he testified that the decision to prepare the first fraudulent invoice was made by Guy Pritchett and communicated directly to Rigby. In light of the nonexistent nature of the evidence to the contrary we are forced to conclude that the *only* evidence in the record indicates that Conklin was not involved as a principal in the mail fraud scheme.

Armco asserts that even if Conklin did not mail a fraudulent statement, Armco's judgment against Conklin can stand if Conklin participated in the bogus invoice scheme only as an aider and abetter. *See* 18 U.S.C. § 2 (aider and abetter is liable as a principal). To establish that Conklin violated the mail fraud statute as an aider and abetter, Armco must have proved that Conklin was associated with the mailing of the bogus invoices, participated in it as something that he wished to bring about, and sought by his actions to make it succeed. *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919, 925 (1949); *United States v. Longoria,* 569 F.2d 422, 425 (5th Cir.1978). To prove Conklin's association with the mailing of the false invoices, there must be evidence that Conklin shared in the criminal intent of the principals. *United States v. Stanley,* 765 F.2d 1224, 1242 (5th Cir. 1985); *Longoria,* 569 F.2d at 425. Proof of "mere negative acquiescence" in the fraud is insufficient, *Longoria,* 569 F.2d at 425; there must be evidence that Conklin "committed an overt act designed to aid in the success of the venture." *Id. See also*

---

**9.** Armco cannot contend that the inventory certificates prepared by Conklin were themselves fraudulent—it is undisputed that they were accurate.

*United States v. Colwell,* 764 F.2d 1070, 1072 (5th Cir.1985).

Armco argues that "planned silence" can constitute aiding and abetting for purposes of 18 U.S.C. § 2. *Cf. United States v. Eucker,* 532 F.2d 249, 254 (2d Cir.1976). Specifically, Armco maintains that the following factors support its contention that Conklin aided and abetted the mailing of the bogus invoices: Conklin knew that there were a large amount of fake invoices, he knew that they were being used by Pritchett to obtain loans, he kept the bogus invoices separate from the legitimate invoices in his calculations, he issued his inventory certificates falsely indicating that business activities at Pritchett were normal, and he violated an affirmative duty to warn Armco of detrimental conditions at Pritchett.

Even accepting the evidence in the record in the light most favorable to Armco, as we must with a jury verdict, we hold that Conklin's failure to expose the existence of the bogus invoices does not rise to the level of aiding and abetting. Although Conklin became aware of the bogus invoices and did nothing to reveal their existence, this awareness and inaction amounted at most to nothing more than "mere negative acquiescence." *Longoria,* 569 F.2d at 425. Since mail fraud is a specific intent crime, *United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980); *United States v. Kent,* 608 F.2d 542, 545 n. 3 (5th Cir.1979), *cert. denied sub nom. Patrick Petroleum Corp. v. United States,* 446 U.S. 936, 100 S.Ct. 2153–54, 64 L.Ed.2d 788 (1980), it is not enough that Conklin's silence allowed the scheme to succeed. Conklin must have shared Pritchett's and Rigby's criminal intent if he is to be found liable as an aider and abetter. Quite simply, there is no proof of this.

Again we reject outright Armco's reliance on Conklin's segregating the bogus and legitimate invoices as evidence of Conklin's participation or criminal intent. As we stated above, it is undisputed that Conklin was hired to prepare accurate inventory certificates and that he did so.

Armco cannot now complain that he should have included in his calculations spurious invoices which he knew did not represent actual shipments from inventory and whose inclusion would have rendered his certificates inaccurate.

Armco also claims that Conklin's violation of his alleged "affirmative duty" to alert Armco to conditions at Pritchett considered detrimental to Armco's interest constituted aiding and abetting the mailing of the bogus invoices. We are convinced, however, that the magnitude of this duty as it was developed at trial was insufficient for its violation to constitute aiding and abetting Pritchett's bogus invoice scheme.

Conklin's written instructions from SLT included the following clause:

> Please notify SLT District or Division Office immediately by telephone, with all details possible, if you should learn of any conditions at [Pritchett's] premises detrimental to our interest or those of [Armco], including any damage to, defect or deterioration in the inventory which is the subject of SLT Inventory Certificates, or knowledge of the filing or potential filing of any legal proceedings or bankruptcy petition against [Pritchett].

This clause created in Conklin a duty to notify SLT if he became aware of conditions at Pritchett detrimental to SLT's or Armco's interest but it created no duty in Conklin to notify Armco. Likewise, there is nothing expressed in the Armco/Pritchett "Inventory Certification Agreement," *see supra* note 1, that gives rise to a duty on SLT's part to notify Armco of any conditions at Pritchett's premises detrimental to Armco's interest.

If the contract is silent, where then does Armco discover either Conklin's or SLT's duty to report to Armco the existence of any conditions at Pritchett detrimental to Armco's interest?

Armco maintains that because there was no merger clause in the Armco/Pritchett/SLT agreement, SLT's instructions to Conklin, although not mentioned in the tripartite agreement, constituted part of that agreement. They further maintain that by

holding out its agents as bonded, SLT warrants their honesty and faithfulness. In addition, Armco solicited testimony from other collateral control firms to the effect that it would be standard practice in the industry for those firms to notify lenders of adverse financial conditions of which they were aware at the borrower's premises. Armco also read the deposition testimony of James Younger, an operations manager for SLT and the SLT employee who was immediately responsible for SLT's operations at Pritchett. He testified that, as a business practice, he would disclose to the lender any knowledge that he had of bogus documentation at the borrower's premises, regardless of whether he felt it was directly related to the specific service he was performing.[10]

█ We need not take issue with any of these assertions in order to reverse the judgment below. Indeed, the jury found that SLT breached both its contract and warranty to Armco,[11] but any breaches of its contract and warranty that occurred through Conklin's failure to alert SLT and SLT's failure to alert Armco to the bogus invoices do not rise to the level of a federal crime. More than a breach of contract or warranty is necessary to find that SLT, through Conklin, was guilty of mail fraud as a principal or as an aider and abetter. Our review of the record reveals no evidence that Conklin "participated in [the bogus invoice scheme] as something that he wished to bring about," that Conklin "sought by his actions to make it succeed," or that Conklin shared the criminal intent of Pritchett and Rigby. *See Longoria*, 569 F.2d 425. The evidence shows nothing more than a man who unwisely closed his

eyes and believed that an unpleasant situation was none of his affair. We decline to elevate the breach of any duty he had to notify his employer into liability for aiding and abetting a violation of the mail fraud statute.[12]

### Conclusion

We find that there is insufficient evidence in the record to support the judgment on the RICO count against either Richard Conklin or SLT, or both. We therefore reverse the judgment on the RICO count below and remand with directions that a judgment for Conklin and SLT be entered on that count.

REVERSED and REMANDED WITH DIRECTIONS.

CLARK, Chief Judge, dissenting:

### WHO'S WATCHING THE WATCHDOG?

Based upon an appellate reappraisal of the facts, the majority overturns the verdict of a properly instructed jury. I respectfully dissent.

To protect its position as Pritchett's creditor Armco employed SLT and Conklin as fiduciaries to monitor Pritchett's inventory condition. SLT described Conklin's responsibilities in a set of "General Instructions" comprising nine single-spaced typed pages, which included the following express trust undertakings:

*Supervision....* You are the SLT Representative on Customer's premises, and your duties and responsibilities, in addition to the specific recordkeeping trans-

---

10. The evidence in the record indicates that Conklin was the only SLT employee with knowledge of the bogus invoices.

11. We again point out that the jury found no damages from the breach of contract, breach of warranty, or fraud verdicts, probably because it believed Armco did not justifiably rely on the fraudulent invoices and did not seek to mitigate its damages. *See supra* note 5.

12. With all deference to Chief Judge Clark's dissent, we think it misses the decisive point. It

emphasizes a breach of Conklin's contract (to his employer and hence to Armco). The Court does not disagree. Indeed, the jury found a breach of this contract, but expressly found no damages. What triggered this judgment was not a breach of contract. That depended wholly on mail fraud violations by Conklin. Whatever Conklin did in keeping accurate inventory records or side copies of spurious invoices had nothing to do with the mailing by others of the bogus sales invoices against which Armco made loans to Pritchett.

action ... [are] to assure that all proper procedures will be followed....

. . . .

[N]otify SLT ... if you should learn of any conditions at Customer's premises detrimental to our interest or those of the Holder....

. . . .

*Inventory Control Records....*

. . . .

It is your responsibility to be sure ... that proper records are kept so that inventory received and withdrawn may be reflected on our Inventory Certificates and Inventory Withdrawal Reports.

. . . .

*Summary....* The performance of your duties and responsibilities.... involve the legal rights of Holder [Armco] and SLT. Any deviation from these instructions constitutes ... a breach of trust....

AGENT'S ACKNOWLEDGEMENT

The undersigned has carefully read and understands the above General Instructions....

. . . .

I understand that I am bonded under Fidelity Bond for the faithful performance of my duties.

. . . .

/s/ Richard Conklin
Agent

In the course of performing his work, Conklin made an initial actual count of Pritchett's inventory. Thereafter, he used invoices and receipts to calculate weekly variations. Pritchett's invoices were critical to Conklin's computations. When Pritchett employees began to create fake invoices, they sought to deceive Conklin by designating the initial shams as "drop shipments" made direct from suppliers to customers and told Conklin they did not affect the warehouse inventory he was keeping. However, when the volume of phony paper grew too great to permit continued deception, Conklin personally began to segregate the real invoices from those he knew to be spurious. He did this shuffling so well that he never mistook a single specious invoice for an actual one. His calculated inventories were always substantially accurate. Only Armco was deceived by the counterfeits. The jury could and did reasonably infer from these facts that Conklin knew Pritchett employees were obtaining Armco's monies through this fraud and that silence on his part was necessary to keep the scam working.

The majority holds Conklin had no duty to disclose to SLT or Armco that $37 million out of $45 million in Pritchett's invoices were bogus because Conklin was only employed to keep an accurate inventory. Thus, they say, his juggling of the records and breach of his trust relationship amounted to "mere negative acquiescence" in an effort to keep his own records "honest." They say that neither he nor SLT had any responsibility for reporting the falsified records Conklin had to identify and deal with as false in order to perform his primary job.

The majority calls Conklin a "watchdog."

Some Watchdog!

Under the majority's view, since Conklin was only hired to watch the goods, it was OK to silently lick the hands of those who were robbing the till.

Both Conklin and SLT were trustees. As such they were bound by higher standards.[1] Obviously the jury so regarded them too, and thus found sufficient evidence to warrant its verdict. The scope of SLT's and Conklin's undertakings and Armco's reasonable expectation of what those undertakings entailed establish that

---

1. In Justice Cardoza's lyrical words, "A trustee is held to something stricter than the morals of the market place. Not honor alone, but the puncti-lio of an honor the most sensitive is then the standard of behavior." *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).

Conklin's silence in the face of a duty to speak made him an aider and abetter of Pritchett's deception. Because Conklin's coverup was both a suppression of information and a breach of trust, the fraudulent mailings to Armco which failed to disclose the fraud were sufficient to support the jury's verdicts against Conklin and SLT.