IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 99-20622

SUMMIT PROPERTIES INC.; SUMMIT PROPERTIES LP; SUMMIT PROPERTIES
PARTNERSHIP LP; STONY POINT/SUMMIT LP; MCGREGOR/MCGUIRE LP;
HENDERSON/MCGUIRE PARTNERS LP; OAK RIDGE/MCGUIRE PARTNERS LP;
WAVERLY PLACE/SUMMIT PARTNERS LP,

                                        Plaintiffs - Appellants,

                        versus

HOECHST CELANESE CORP., formerly known as Celanese Corporation;
HOECHST CORPORATION; E. I. DUPONT DE NEMOURS, AND CO.; SHELL OIL
COMPANY, doing business as Shell Chemical Company; VANGUARD
PLASTICS INC.; BOW INDUSTRIAL CORP.; HOUSEHOLD INTERNATIONAL INC.,

                                        Defendants - Appellees.

Appeal from the United States District Court
For the Southern District of Texas

June 7, 2000

Before HIGGINBOTHAM and PARKER, Circuit Judges, and WARD,[*] District
Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Today we are invited to read RICO as establishing a federal
products liability scheme complete with treble damages and attorney
fees for the benefit of end-users of defective products who never
relied on manufacturers' alleged misrepresentations of product
quality. We are unpersuaded that RICO can be extended so far by
such a marriage of distinct duties and liability regimes.
Consequently, we AFFIRM the dismissal of the plaintiffs' RICO

---

[*]District Judge of the Eastern District of Texas, sitting by designation.

claims against the defendant manufacturers of polybutylene plumbing systems and components.

I

The plaintiffs own properties in which polybutylene (PB) plumbing systems were installed. PB is a by-product of oil-refining. In the 1970s, Shell Oil Company purchased the exclusive right to sell PB in the U.S. for a 10-year period. Shell then sold PB resin pellets to pipe extruders, such as Vanguard and Bow, who made tubing from the pellets. The defendants in this suit are manufacturers who sold either PB plumbing systems or their components parts, including Shell, DuPont, Hoechst Celanese, Household International, Vanguard, and Bow.

The plaintiffs contend that the defendants manufactured and marketed these systems and components through a complex scheme to defraud. The claims revolve around core allegations that the defendants made knowingly false claims in marketing PB, including assertions that (1) it is suitable for use as a hot and cold potable water plumbing systems; (2) it will last 50 years; (3) it will not corrode; (4) it is easy, reliable, simple, proven and fast; and (5) it will not occasion serious service problems.

The truth, plaintiffs allege, is that PB plumbing is worse than worthless, that it not only fails to perform its intended function, but also that it causes severe property damage; that PB's inherent defects render it unsuitable for use as a water distribution system, including the fact that after installation, such systems degrade, crack, leak, and spray water.

The plaintiffs allege that the defendants engaged in a conspiracy to defraud by directing a massive, fraudulent marketing plan designed to make PB the "material of choice" in the plumbing

market, so that by the end of Shell's ten-year period of exclusive rights, Shell would have a commanding market position. This marketing campaign was directed at building code approval officials, members of the building industry such as builders and plumbers, and other consumers.

## II

The plaintiffs filed suit in district court alleging violations of civil RICO.[1] The district court granted the defendants' Rule 12(b)(6) motion to dismiss because the plaintiffs conceded that they did not detrimentally rely on any of the defendants' allegedly fraudulent misrepresentations that served as the basis for the RICO claims. The district court held that such reliance is a necessary predicate for establishing proximate cause under RICO. It denied a motion for reconsideration, and the plaintiffs appealed.

## III

RICO provides that "[a]ny person injured in his business or property <u>by reason of</u> a violation of section 1962 of this chapter may sue therefor . . . ."[2] The Supreme Court, in <u>Holmes v. Securities Investor Protection Corp.</u>,[3] explicitly confirmed that the "by reason of" language in RICO requires a causal connection between the predicate mail or wire fraud and a plaintiff's injury that includes "but for" and "proximate" causation.[4]

---

[1] 18 U.S.C. § 1961 <u>et</u> <u>seq.</u>

[2] 18 U.S.C. § 1964(c) (emphasis added).

[3] 503 U.S. 258 (1992).

[4] <u>See</u> <u>id.</u> at 265-68.

3

The question before us is whether a plaintiff's reliance on the predicate mail or wire fraud is necessary in order to establish proximate causation. In Armco Industries Credit Corp. v. SLT Warehouse Co.,[5] this court distinguished mail fraud under RICO from common law fraud and stated that "to find a violation of the federal mail fraud statute it is not necessary that the victim have detrimentally relied on the mailed misrepresentations."[6] Ours is a different question.

It is true that the court in Armco found no error when the trial judge refused to instruct the jury that a showing of reliance was necessary in order to establish proximate causation under RICO.[7] It is equally the case that the court observed that reliance is not an element of the underlying offense of mail fraud, and ignored the issue of whether such reliance would be necessary in order to prove proximate causation.[8] Armco aside, these issues are distinct: the government can punish unsuccessful schemes to defraud because the underlying mail fraud violation does not require reliance, but a civil plaintiff "faces an additional hurdle" and must show an injury caused "by reason of" the violation.[9]

When Armco was decided, the Fifth Circuit had not yet interpreted the "by reason of" language of 18 U.S.C. § 1964(c) to

---

[5]782 F.2d 475 (5th Cir. 1986).

[6]Id. at 482 (emphasis added).

[7]See id.

[8]See id. at 481-82.

[9]Pelletier v. Zweifel, 921 F.2d 1465, 1498, 1498-99 (11th Cir. 1991).

4

impose a proximate causation requirement,[10] and this circuit still allowed recovery for more indirect injuries.[11]  Since that time, the Fifth Circuit in Zervas v. Faulkner[12] and the Supreme Court in Holmes have explicitly adopted a traditional proximate causation requirement.[13]   Armco does not then answer the question before us: whether reliance is necessary to establish proximate cause under RICO.  To hold otherwise would imply that Armco silently imposed a proximate causation requirement that was not explicitly adopted until several years hence in Zervas and Holmes.[14]  To the extent it

---

[10]See Zervas v. Faulkner, 861 F.2d 823, 834 (5th Cir. 1988) (adopting the proximate causation requirement and joining the Second, Fourth, and Seventh Circuits); see also id. (noting that a similar approach was taken in National Enterprises, Inc. v. Mellon Financial Services Corp., 847 F.2d 251 (5th Cir. 1988), but that the term "proximate cause" was not employed).

[11]See Ocean Energy II, Inc. v. Alexander & Alexander, 868 F.2d 740, 744 (5th Cir. 1989) ("[W]e [have] rejected the position taken by the Seventh, Eleventh and possibly Third Circuits interpreting the language in [Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985)] as allowing recovery only for direct injuries.").

[12]861 F.2d 823 (5th Cir. Dec. 15, 1988).

[13]Holmes, 503 U.S. at 265-68; Zervas, 861 F.2d at 834.

[14]Since Holmes this circuit has stated that "reliance is not an element of mail fraud" for RICO liability.  See Akin v. Q-L Investments, Inc., 959 F.2d 521, 533 (5th Cir. 1992).  In Akin, however, this court noted only that reliance is not an element of an underlying mail or wire fraud violation.  See id. (citing Abell v. Potomac Ins. Co., 858 F.2d 1104, 1129 (5th Cir. Nov. 2, 1988)).  Whether the plaintiff's damages were proximately caused by reason of such violation was not at issue. See id.
Abell cited Armco for the proposition that reliance is not an element of the underlying mail or wire fraud.  See Abell, 858 F.2d at 1129.  Like Armco, Abell was decided before Zervas and did not discuss the issue of whether reliance is necessary for proximate causation.  Instead of arguing proximate cause, the defendant claimed that "the evidence did not establish . . . any causal connection between the plaintiffs'  . . . injuries and [the defendant's] misrepresentations."  Id. at 1129 (emphasis added).  The Supreme Court subsequently vacated Abell, see Fryar v. Abell, 492 U.S. 914 (1989), and on remand this court remanded the case to the district court for reconsideration, see Abell v. Potomac Ins. Co., 884 F.2d 196 (5th Cir. 1989).  In the second appeal to this court, issues related to reliance did not arise.  See Abell v. Potomac Ins. Co., 946 F.2d 1160 (5th Cir. 1991).

held that proximate cause was not required, it has been overturned by <u>Holmes</u>.

On appeal, the plaintiffs do not quarrel with the district court's acceptance of their concession that they "did not rely on anything Defendants said or published in purchasing their properties."[15]  Instead, the plaintiffs steadfastly maintain that individual acts of reliance are simply unnecessary in order to recover for damages resulting from civil RICO fraud.  Most other circuits, however, require a showing of detrimental reliance by the plaintiff,[16] which is consistent with <u>Holmes</u>' admonition that federal courts employ traditional notions of proximate cause when assessing the nexus between a plaintiff's injuries and the underlying RICO violation.[17]

The rationale for requiring reliance in cases such as this one becomes clear in the light cast by the distinction between causation as an element of a claim for fraud and producing cause as

---

[15]Plaintiffs' Memorandum of Law in Reply to Various Motions and Memoranda of Defendants, at 24 ¶ 43 [R. 1198], <u>quoted in</u> Memorandum Opinion and Order, at 2 [R. 1241]; <u>see also</u> Brief of Appellants, at 6 ("Because it did not have to do so, Summit did not claim that it relied on [the defendants'] misrepresentations and omissions regarding [the] inherently defective and worthless plumbing system.").
The plaintiffs only remaining allegations of reliance involved the "technically accurate" representations by various entities who stated that the plaintiffs' properties confirmed to the local building codes. See Plaintiffs' Second Amended Complaint, at 24 ¶ 73 [R. 892]; Plaintiffs' Memorandum of Law in reply to Various Motions and Memoranda of Defendants, at 25 ¶ 45 [R. 1197]. Reliance on technically accurate representations by entities other than the defendants is not reliance upon misrepresentations by the defendants.

[16]<u>See, e.g.</u>, <u>Ideal Dairy Farms, Inc. v. John Labatt, Ltd.</u>, 90 F.3d 737, 746-47 (3d Cir. 1996); <u>Chisholm v. Transouth Fin. Corp.</u>, 95 F.3d 331, 337 (4th Cir. 1996); <u>Appletree Square I v. W.R. Grace & Co.</u>, 29 F.3d 1283, 1286 (8th Cir. 1994); <u>Central Distribs. of Beer, Inc. v. Conn</u>, 5 F.3d 181, 184 (6th Cir. 1993); <u>Pelletier v. Zweifel</u>, 921 F.2d 1465, 1499-500 (11th Cir. 1991); <u>County of Suffolk v. Long Island Lighting Co.</u>, 907 F.2d 1295, 1311 (2d Cir. 1990); <u>Reynolds v. East Dyer Dev. Co.</u>, 882 F.2d 1249, 1253 (7th Cir. 1989).
[17]<u>See</u> <u>Holmes</u>, 503 U.S. at 268.

6

an element of a claim for products liability.[18] The linkage between design defect and injury is between the <u>defect</u> and the injury. With a claim for fraud, however, the linkage is between the defendants' <u>fraud</u> and the injury.

As a product travels in the stream of commerce, inherent defects are carried with it, but fraudulent statements are not. With the abolition of privity requirements, injuries produced by product defect may be actionable by all users including those remote in the distribution chain from a defendant manufacturer. The causal connection between a misrepresentation and a subsequent harm, however, vanishes once the product travels beyond the entity who actually relied on the representation when making the purchasing decision.

In other words, even if intermediary builders, plumbers, code officials, or prior owners relied on the defendants' alleged misrepresentations when choosing to use or approve PB plumbing, that does not tell us whether the defendants' fraud proximately caused the plaintiffs' injuries, for which the defect was a producing cause. At best, any fraud during the sale of those products proximately injured only those initial purchasers who relied on the alleged misrepresentations, since the fraud facilitated a sale that might not otherwise have been made.

Of course, if the sales would not have occurred absent the fraud, the fraud would have been a "but-for" cause of the

---

[18]To recover under Texas products liability law, a design defect must be a "producing cause" of injury. <u>See</u> Tex.Civ.Prac. & Rem.Code Ann. § 82.005(a). A producing cause is "an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages complained of, if any." <u>Rourke v. Garza</u>, 530 S.W.2d 794, 801 (Tex. 1975). Our reference to Texas law, however, is for purposes of illustration only.

7

plaintiffs' injuries.[19]   Nevertheless, the plaintiffs came into possession of PB systems without relying on the alleged fraud. Whether they received their systems from the manufacturers or from prior property owners, any past fraud was not a proximate cause of the plaintiffs' resulting injuries since fraud did not induce the purchase transactions.[20]

This is only to recognize the distinct character of claims for fraud and claims for defective products resting on the law of products liability.  In general, fraud addresses liability between persons with direct relationships – assured by the requirement that a plaintiff has either been the target of a fraud or has relied upon the fraudulent conduct of the defendants.  The Fourth Circuit, recognizing the target wing of these twin limits of liability, held open the possibility that a plaintiff company may not need to show reliance when a competitor lured the plaintiff's customers away by fraud directed at the plaintiff's customers.[21]  In the current case, for example, the defendants' competitors might recover for injuries to competitive position, but that circumstance is of no aid to these plaintiffs.  Accepting as claimed that the defendants' strategy may have been to gain market share by fraud in the initial sale of PB components, it is not contended that these particular

---

[19]If the relevant decisionmakers knew the limitations of the product but would have bought it anyway because of its low price, for example, the fraud would not have been a "but-for" cause of the plaintiffs' damages.

[20]See Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1318 (11th Cir. 1998) (noting that a plaintiff's injury is not proximately caused by a defendant's misrepresentations when the injury results only from the detrimental reliance of a third party).

[21]See Mid Atlantic Telecom, Inc. v. Long Distance Services., Inc.,18 F.3d 260, 263-64 (4th Cir. 1994).

plaintiffs were the targets of a scheme to defraud accomplished by defrauding others.[22]

Plaintiffs' able counsel has understandably fled to the "fraud on the market" theory of constructive reliance, a theory born in securities litigation. It assumes that prices in an efficient market incorporate the relative importance of public information, whether that information is true or false.[23] If publicly announced information regarding a security is fraudulent, a subsequent purchaser of that security from the market is said to have constructively relied on the fraudulent statements because they were incorporated into the market price. The case proceeds despite the fact that the defendant and the purchaser had no direct relationship and reliance upon the false statements could not be shown. This because under the theory, the market as an efficient translator of data to price acted as an intermediary, connecting plaintiff and defendant.

---

[22]Similarly, we do not think the current situation is similar to one discussed in Holmes, where the Court left open the possibility that the customers of an insolvent brokerage might recover under RICO for losses stemming from a series of fraudulent brokerage transactions despite the fact that those customers did not in any sense "rely" on a misrepresentation. See 503 U.S. at 272 n.19.

In that situation, the fraudulent brokerage transactions imposed immediate risks on the brokerage's customers by increasing the likelihood of the brokerage's insolvency, even if the conspirators did not intend such risks to fall on those customers through their sham transactions.

Nevertheless, when an action poses a high and foreseeable risk on a third party, we may view the resulting injury as deliberate for the purpose of liability. See, e.g., Matter of EDC, Inc., 930 F.2d 1275, 1279 (7th Cir. 1991) (Posner, J.). In that sense, the brokerage customers may be seen as direct and contemporaneous victims of the fraudulent scheme and within the scope of the already noted exception.

In the present case, however, the plaintiffs' risks of injuries did not arise as direct and contemporaneous results of any alleged fraud, but instead arose only later, through the purchases of allegedly defective plumbing by transactions which were not tainted with fraud.

[23]See Basic Inc. v. Levinson, 485 U.S. 224, 244-47 (1988) (citing In re LTV Sec. Litig., 88 F.R.D. 134, 143 (ND Tex.1980)).

9

No court has accepted the use of this theory outside of the context of securities fraud, and one circuit has expressly rejected its use in the context of a similar civil RICO case.[24] An efficient market is a critical element of a market's role as an intermediary. There is no pretense of such a market here and the fraud on the market doctrine is not applicable.

IV

In sum, when civil RICO damages are sought for injuries resulting from fraud, a general requirement of reliance by the plaintiff is a commonsense liability limitation. To hold otherwise would allow the threat of treble damages and attorney fees to infiltrate garden variety products liability cases whenever marketing promotions touted the merits of the products, even if no plaintiff relied on those representations. This is not a statement of our policy choice. We are not persuaded that by its "by reason of" phrase Congress intended such a federalization and escalation of the states' laws of product liability – laws that have hardly been proved to be anemic in their common law use of economic incentives to achieve desired social goals. The threshold reliance requirement is determinative in this case. We need not and do not reach other issues raised by the defendants. Agreeing with the district court, we AFFIRM its dismissal of this suit.

AFFIRMED.

---

[24]See Appletree Square I v. W.R. Grace & Co., 29 F.3d 1283, 1287 (8th Cir. 1994).